IN RE: INQUIRY CONCERNING A JUDGE NO. 53 LINWOOD T. PEOPLES

No. 71

(Filed 29 December 1978)

**1. Courts § 2— statute conferring jurisdiction over class—power over person not member of class**

When a statute confers power on a court or administrative body to adjudicate cases involving the members of a certain class, a court's attempt to exercise its power over one who is not a member of that class is void for lack of jurisdiction.

**2. Courts § 2— jurisdiction—state of affairs when invoked**

The jurisdiction of a court depends on the state of affairs existing at the time it is invoked.

**3. Courts § 2.1— jurisdiction over person, subject matter—how obtained**

Jurisdiction over the person of a defendant or respondent is obtained by service of process upon him, by his voluntary appearance or consent; jurisdiction of a court or administrative agency over the subject matter of a proceeding is derived from the law which organized the tribunal and cannot be conferred upon a court by consent, waiver or estoppel.

**4. Public Officers § 3— resignation—effective date**

When a resignation of a public officer specifies the time at which it will take effect, the resignation is not complete until that date arrives.

**5. Courts § 2— attachment of jurisdiction—effect of subsequent events**

Once the jurisdiction of a court or administrative agency attaches, the general rule is that it will not be ousted by subsequent events, even when the events are of such a nature that they would have prevented jurisdiction from attaching in the first instance.

**6. Judges § 7— jurisdiction over misconduct charges—subsequent resignation of judge**

The Judicial Standards Commission and the Supreme Court acquired jurisdiction over a district court judge and the charges against him when the Commission filed its complaint against the judge, and such jurisdiction was not divested by the judge's resignation which became effective two days after the complaint was filed.

**7. Actions § 3— moot question**

Whenever during the course of litigation it develops that the relief sought has been granted or that the questions originally in controversy between the parties are no longer at issue, the case should be dismissed, for the courts will not entertain or proceed with a cause merely to determine abstract propositions of law.

**8. Judges § 7— action to remove judge—other sanctions—resignation of judge—mootness**

A proceeding before the Judicial Standards Commission to remove a district court judge from office was not rendered moot by respondent judge's resignation from office since the remedies against a judge who engages in serious misconduct justifying his removal include not only loss of present office but also disqualification from future judicial office and loss of retirement benefits.

**9. Trial § 12— failure of defendant to testify—consideration in civil proceeding**

It is only in criminal cases that the failure of the defendant to testify creates no presumption against him. In all other proceedings the failure of a party to take the stand to testify as to facts peculiarly within his knowledge and directly affecting him is a pregnant circumstance for the fact finder's consideration.

**10. Judges § 7— misconduct—improper disposition of case**

Any disposition of a case by a judge for reasons other than an honest appraisal of the facts and the law, as disclosed by the evidence presented, will amount to conduct prejudicial to the proper administration of justice.

**11. Judges § 7— misconduct—absence of personal benefit**

The fact that a judge receives no personal benefit, financial or otherwise, from his improper handling of a case does not preclude his conduct from being prejudicial to the administration of justice.

**12. Judges § 7— criminal cases—necessity for disposition in open court**

The trial and disposition of criminal cases is the public's business and ought to be conducted in open court.

**13. Judges § 7— misconduct—criminal cases—disposition without notice to district attorney**

Any disposition of a criminal case without notice to the district attorney who was prosecuting the docket when the matter was not on the printed calendar for disposition improperly excluded the district attorney from participating in the disposition.

**14. Judges § 7— misconduct—ex parte disposition of case**

A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider *ex parte* or other communications concerning a pending or impending proceeding.

**15. Judges § 7— misconduct—payment of fine and costs for defendant**

A judge may not with propriety handle any financial transaction for a defendant (or any other party) which is incident to a case in which he sits in judgment. *A fortiori*, if a judge is indiscreet enough to take money for the purpose of paying a defendant's fine and costs he should forthwith pay it to the clerk of court, and any use or retention of such funds, whether it be inadvertently, forgetfully, or because the judge is short of cash and intends to

apply the money eventually to the purpose for which it was received, if not criminal, is wilful misconduct in office and conduct prejudicial to the administration of justice that brings the judicial office into disrepute.

**16. Judges § 7— conduct prejudicial to administration of justice—wilful misconduct in office—seriousness**

Conduct prejudicial to the administration of justice, unless knowingly and persistently repeated, is not per se as serious and reprehensible as wilful misconduct in office, which is a constitutional ground for impeachment and disqualification for public office. Art. IV, § 4, and Art. VI, § 8 of the N. C. Constitution.

**17. Judges § 7— removal of judge—disqualification from further judicial office—wilful misconduct in office**

A judge should be removed from office and disqualified from holding further judicial office only for the more serious offense of wilful misconduct in office.

**18. Judges § 7— wilful misconduct in office—removal—disqualification from further judicial office—loss of retirement benefits**

Respondent district court judge is removed from office by the Supreme Court, disqualified from holding further judicial office and disqualified from receiving retirement benefits for "wilful misconduct in office" on the basis of the following conduct: (1) respondent consistently and improperly precluded the district attorney from participating in the disposition of cases on which he was entitled to be heard on behalf of the State, and removed the disposition of cases from public view in open court by transacting the court's business in secrecy; (2) respondent dismissed three criminal cases without a trial, in the absence of the defendant, without knowledge of the district attorney, and on a day when the cases were not calendared for trial; (3) respondent caused the clerks of three counties to remove cases from the active criminal dockets in those counties and to hold such cases in special files until he directed otherwise, in consequence of which those cases were not tried speedily or calendared and disposed of in open court in the normal course of business in the district courts of the respective counties; and (4) respondent from time to time paid to the clerk money which he had collected from defendants in cases which he disposed of in their absence; on two occasions respondent recieved money to pay a defendant's court costs when respondent disposed of his case, but respondent neglected to dispose of the case and never paid the costs or returned the money to defendant; and in a third such case respondent returned the money after keeping it eleven months and only after another judge had disposed of the case.

**19. Judges § 7— wilful misconduct in office—removal—disqualification from further judicial office—constitutionality**

The provisions of G.S. 7A-376 which bar a judge who has been removed for misconduct from future judicial office are authorized by Art. IV, § 17(2) of the N. C. Constitution. Furthermore, an adjudication of "wilful misconduct in office" by the Supreme Court in a proceeding instituted by the Judicial Standards Commission in which the judge or justice involved has been accorded due process of law and his guilt established by "clear and convincing evidence"

is equivalent to an adjudication of guilt of "malpractice in any office" as used in Art. VI, § 8 of the N. C. Constitution, and such constitutional provision also authorized the legislature to make disqualification from judicial office a consequence of removal for wilful misconduct under G.S. 7A-376.

**20. Judges § 7— wilful misconduct in office—removal—loss of retirement benefits—constitutionality**

The General Assembly acted within the authority given it by Art. IV, § 8 of the N. C. Constitution to "provide by general law for the retirement of Justices and Judges" when it provided in G.S. 7A-376 that a judge who is removed from office for cause other than mental or physical incapacity shall receive no retirement compensation.

THIS proceeding is before the Court upon the recommendation of the Judicial Standards Commission (Commission) that Linwood T. Peoples (Respondent), a judge of the General Court of Justice, District Court Division, Ninth District, be removed from office as provided in G.S. 7A-376 (Cum. Supp. 1977). The recommendation, filed in the Supreme Court on 25 April 1978, was argued as Case No. 71 on 15 November 1978.

On 1 December 1977 the Judicial Standards Commission, in accordance with its Rule 7 (J.S.C. Rule 7), 283 N.C. 763-770 (1973), notified Respondent that on its own motion it had ordered a preliminary investigation to determine whether formal proceedings should be instituted against him under J.S.C. Rule 8. The notice informed Judge Peoples (1) that the subject of the investigation would be his "alleged misconduct in the handling or disposition of criminal cases in the Ninth Judicial District, including the placing of numerous criminal cases in an inactive file in lieu of disposing of such cases in open court"; (2) that the investigation, reports and proceedings before the Commission would remain confidential as provided in J.S.C. Rule 4; and (3) that he had the right to present to the Commission for consideration "such relevant matter" as he might choose.

Judge Peoples had been a district court judge since 2 December 1968, the date the district court was established in the Ninth Judicial District. On 10 January 1978 Judge Peoples tendered his resignation as a district court judge to the Governor in the following letter:

"Honorable James B. Hunt, Jr.
Governor of the State of North Carolina
Raleigh, North Carolina 27602

Dear Governor Hunt:

I hereby submit my resignation as a Judge of District Court for the Ninth Judicial District, State of North Carolina, effective February 1, 1978.

I have been honored to serve the people of the District as a District Court Judge and hope to continue to serve them in some other capacity within the Judiciary.

Respectfully,

s/ LINWOOD T. PEOPLES"

On 20 January 1978 Governor Hunt accepted Judge Peoples' resignation to be effective on 1 February 1978.

On 30 January 1978 Judge Peoples was served with a formal complaint and notice which informed him (1) that the Commission had concluded "upon the original complaint and the evidence developed by the preliminary investigation" that formal proceedings should be instituted against him; (2) that H. D. Coley, Jr., would act as special counsel for the Commission; (3) that the charges against him were (a) wilful misconduct in office, and (b) conduct prejudicial to the administration of justice that brings the judicial office into disrepute; (4) that the alleged facts upon which the foregoing charges were based are specifically set out in the verified complaint attached to the notice; and (5) that it was his right to file a verified answer to the charges within 20 days.

The complaint, in summary, alleged the following:

Count I. In April, July, and September 1976 Respondent dismissed three separate criminal cases pending in the District Court of Vance County against defendants Briley, Catlett, and Riggan without having calendared the cases for trial, without notice to the district attorney, and without entering the judgment in open court.

Counts II, III, and IV. Over a period of years Respondent caused specified criminal cases to be removed from the active

pending-case files in Vance, Granville, and Franklin Counties and placed in an inactive or special "Judge Peoples file" where they were retained for varying lengths of time before being dismissed or otherwise disposed of without having been regularly calendared for trial, without notice to the district attorney, and not in open court in the normal course of business. On 13 September 1977, in Vance County, 27 cases were pending in Judge Peoples' special file; 18 such cases in Franklin County; and four cases in Granville County.

Count V. In three of the cases enumerated in Counts II, III, and IV, the defendants—Smith, Walker, and Hudson—had each paid, or caused to be paid the sum of $27.00 ("the cost of court") to Respondent, who had agreed "to take care of" the respective traffic citations. The money paid in behalf of Walker and Hudson was never returned to the payor; the $27.00 which Smith paid was returned to him in September 1977 after his case was calendared for trial before the Chief District Court Judge of the Ninth Judicial District.

Judge Peoples has filed no answer to the charges contained in the complaint. His only pleading is a special appearance, filed 17 February 1978, in which he moved to dismiss this proceeding on the ground that the Commission's jurisdiction extended only to persons holding judicial office and, the Governor having accepted his resignation, "Respondent is not now a judge."

After considering the briefs filed by Respondent and Special Counsel, the Commission denied the motion to dismiss and scheduled a formal hearing upon the charges set out in the complaint. At this hearing, which began 31 March 1978, Mr. Eugene Boyce of the Raleigh Bar and Mr. Bobby W. Rogers of the Henderson Bar appeared in behalf of Respondent. In answer to the chairman's inquiry whether Respondent would be present for the hearing, his counsel informed the Commission that it was Judge Peoples' "election" not to be present. Special Counsel Coley then presented the evidence against Respondent. Respondent offered no evidence but his attorneys cross-examined the witnesses whom Mr. Coley called and examined. A summary of the evidence adduced at the hearing follows:

From May 1969 until September 1976 Mrs. Lucy Longmire was the courtroom clerk for the criminal sessions of the District Court of Vance County. In September 1976 she became an assistance clerk of the Superior Court, and Mrs. Jo Whitus took over her duties as criminal courtroom clerk in the District Court. Mrs. Longmire's testimony tended to show the following facts:

In Vance County the clerk keeps three separate records of every criminal case docketed in the District Court: (1) an index card on which is recorded the name of the case, the date of trial, any continuances, a short description of the charge, and the final disposition of the case (In the other counties of the District an index book is used instead of an index card. Both serve the same function); (2) the shuck, a drop-type, glassine-front envelope which holds the warrant or traffic ticket and all succeeding papers filed in the case, including the final judgment; and (3) the court calendar, which is prepared for each day the court is in session for the trial of criminal cases. The courtroom clerk keeps the calendar, which lists every case scheduled for trial that day by name and docket number with a "shorthand" designation of the charge. This daily calendar constitutes the minutes of the court, records the disposition of each case, and is kept as a permanent record. If a case is not tried as scheduled on the calendar a notation shows the date to which it is continued. If the court disposes of a case which was not originally listed on the calendar, that case would be added to the calendar at the time of disposition.

Sometime after Mrs. Longmire became courtroom clerk she established a special file labeled "LTP File." She did this in order to keep up with the cases which Judge Peoples had given to her "with instructions" to hold for his later disposition. The file was kept on the corner of her desk. Judge Peoples was aware that this file was the repository of the shucks containing the cases he had told her to hold. The cases in the "LTP File" did not qualify for the "inactive file" because all the defendants had been served with criminal process and no entry showed them to be beyond the jurisdiction of the court.

As long as a case remained in the "LTP File" it would not be placed on a trial calendar unless Judge Peoples instructed the courtroom clerk to calendar it. Mrs. Longmire was unable to estimate "the average number of cases which stayed in that file,"

but she said that "over a period of two or three years" some cases were disposed of and new ones were added. No other judge kept a special file or had a place in which pending cases were "held up." From time to time the other district court judges would continue a case or delay a decision, but when that was done they usually recalendared the case for a definite date.

Other than telling her to hold a particular case in suspension until further notice, Mrs. Longmire said Judge Peoples never gave her any instructions with reference to the shucks in his file. He never gave her any money "to pay or remit the costs in any of the cases that were in the 'LTP File.'" When questioned specifically with reference to the calendaring of cases which Judge Peoples dismissed after having had them held up in the "LTP File," Mrs. Longmire said that some of these dismissals were made when the case was not actually calendared. In those instances, in order for her minutes to show those dispositions she would add the case to a calendar at the next session after he had signed the judgment in the case.

In July 1976, after being trained by Mrs. Barnett and Mrs. Longmire, Mrs. Jo Whitus succeeded Mrs. Lucy Longmire as the courtroom clerk who "takes care of District Criminal Court in Vance County." Her testimony tended to show:

At the time Mrs. Whitus was first employed as deputy clerk in 1976 she was aware of the existence of the Judge Peoples file. The procedures relating to the maintenance of the "LTP File" had been in effect several years before she became courtroom deputy, but she did not know how long. When she became courtroom clerk she took over Mrs. Longmire's desk in the vault, and the "LTP File" continued to remain on top of her desk. However, "on a couple of occasions" Judge Peoples took it to his office. No attempt was ever made to conceal the presence of the file. Neither the district attorney, any of his assistants, nor the clerk of the Superior Court, Mr. Hight, ever inquired about the status of this file or gave any instructions with reference to it. When asked if the clerk of the court knew about that particular file she replied, "I'm not sure." None of the other judges ever asked her about a specific case in the "LTP File," and she does not know whether they ever saw it or knew about it. None of the other judges kept such a file and she received no instructions from any

of them "relating to different criminal court cases . . . none other than judgments given in court."

Mrs. Whitus explained that the procedure by which particular files were lodged in the "LTP File" varied. Sometimes Judge Peoples would come by her desk in the vault and inquire whether "we had a case for so and so person . . . and ask that the case be put in his file." Sometimes in court when the district attorney would call a case Judge Peoples would have him bring the shuck to the bench. Then Respondent would hand it to Mrs. Whitus and tell her what he wanted done with it, and she usually wrote "LTP File" on the shuck. The pink copies of traffic citations were handled similarly. Respondent would either give her a judgment at the time he handed them to her or tell her "to put it in his file." When he gave her the citation in court, she said, "the case may have just been called up and it may not have been called."

On cross-examination, when Mrs. Whitus was asked to explain the procedure followed in Vance County to secure a continuance and the recalendaring of a case, she replied, "All the cases set for a certain day are docketed and taken to the courtroom and then continued there if the solicitor allows them. Occasionally, when Judge Peoples was there he would come down and say continue this case until my next day and I would pull it out and put it on for when he said." To her knowledge no advance continuances were ever given by any other judge, but "on a couple of occasions the district attorney may have agreed to a continuance."

Mrs. Whitus and Mrs. Longmire both testified that once a case had been put in the "LTP File," it would not get back on the active criminal docket unless Judge Peoples requested it. "Sometimes he would come down and ask that the case be put on the calendar for his next day in court." After he had rendered a judgment in the case from his personal file the case file was disposed of just like any other.

At times Judge Peoples rendered and entered judgments out of court and out of term, but Mrs. Whitus could give no estimate of the number of such judgments. He never paid any costs or fines for a defendant in court but, on occasions, "after

court or some day after" he had entered a judgment he would deliver money to Mrs. Whitus for the costs and fine. Sometimes he would enter judgment at the time he handed her the money, "or he would have already rendered the judgment."

On cross-examination, after Mrs. Whitus had testified that she had recorded all the judgment entries which Judge Peoples had instructed her to make, Respondent's counsel asked her the following questions and she made the following answers:

Q. Well, he never told you to back date anything, did he? Show it dated on the term of court rather than on the day that you actually made the date?

A. Yes, he did.

Q. What did he tell you on those? How many occasions was that?

A. I don't know.

Q. Do you remember doing it or. . . .?

A. No, I didn't do it.

Q. On the occasions of those entries, was the request to make it an entry to correspond with the court session?

A. Yes it was.

Q. And was that in reference to the remission of any money for court costs or was it just on a dismissal of a case?

A. I don't remember what any of the judgments were.

Q. Did you discuss that with anybody else in the clerk's office?

A. No.

Q. You dated it whenever the date your writing appeared on it?

A. I dated it the day he gave me the judgment, unless he had said the case was calendared for a certain day and he says I'll tell you what to do on Monday or on Wednesday or some other day and that if it had been calendared for last Friday he just got around to telling me what to do with it

on Wednesday I would date it the last Friday, but in that case ya'll would have never found the case to begin with.

Prior to July 1977 "when the auditors came" no judge, district attorney, or official in the clerk's office had ever told Mrs. Whitus to do anything with respect to the "LTP File" and the shucks in it except what she had been doing. From time to time, however, Mrs. Barnett would ask her to ask Judge Peoples "to do something with some of them . . . set them for a court day or tell us what to do with them because they were getting cumbersome." Mrs. Whitus would comply with that request, and "Judge Peoples did make some setting of them from time to time or make some disposition of them and that would help cut the number of them back down."

Mrs. Joyce Merritt joined the staff of the Franklin County Clerk of Court in January 1969. Six months later she became a courtroom clerk. Her testimony tended to show she worked with all the district court judges of the Ninth Judicial District, none of whom were residents of Franklin County. When she first started to do courtroom work she could not complete all the judgments in time for the judges to sign them before the end of the court day; so she made a file for each judge into which she put his unsigned judgments. If the judge would "be back next week," she would get his signature then; if not, she would mail the judgments to him. However, after she became proficient in her job she discontinued all the files except the one for Judge Peoples. So many cases had accumulated in it that she had no other way to keep up with them.

From time to time Judge Peoples would give Mrs. Merritt instructions to place the shucks of specific cases in his file or would hand her a defendant's pink copy of a traffic citation to put in his file. These shucks and citations remained there until he told her to schedule a case for a particular date and notify the defendant and witnesses or until he entered judgments in the cases. On some days, before court, he would instruct Mrs. Merritt to "pull a file and put it in his folder."

Mrs. Merritt made no effort to conceal the cases which Judge Peoples had ordered pulled from the regular file for pending cases; she kept the "LTP" cases in wooden stack boxes on the corner of her desk. The difference between the files which Mrs.

Merritt had kept for other judges and the Judge Peoples "file" was that Mrs. Merritt did not hold any cases for them in which judgment had not been rendered; she held for their signatures only judgments which had been previously announced.

The judges in the Ninth Judicial District were "on a rotating basis," and Judge Peoples (a resident of Vance County) held court in Franklin County twice a month. Each time he came Mrs. Merritt would "hand up" his file and remind him that the cases "were getting some age on them." He would look through the cases and sometimes he would enter a judgment and sometimes he would not. If he entered judgment, the case was "added on" to the day's calendar so there would be a record of the costs and she would have some minutes, "but how it came to pass was not clear." As to the cases in which he did not enter judgments, Judge Peoples instructed Mrs. Merritt to retain them in his file. When he entered these judgments the defendant was "not in all cases present," and—to her knowledge—the district attorney was neither consulted nor given any notice of the court's action. The cases would not be actually called out in court.

On a few occasions Judge Peoples gave Mrs. Merritt the money to pay the costs in cases that were in his file. Several times, while he was on the bench, he handed her a defendant's traffic citation (pink slip or ticket) and told her what kind of judgment to enter—"pay the costs, or costs and fine, prayer for judgment continued." At the same time he would hand her cash in the amount the judgment demanded. The district attorney never called these cases, and he would not necessarily know what case the judge was handling. Mrs. Merritt sat right beside Judge Peoples "and he would pass it to her." At the time he handed the pink slip and money to her he had heard no evidence, but the judgment would show a plea of guilty or a verdict of guilty or usually both. Sometimes the plea of guilty was to a lesser offense than the one charged. When Mrs. Merritt was asked if "that would happen with the defendant not being present" her reply was, "Yes, sir; it has happened."

So far as Mrs. Merritt could recall no judge except Judge Peoples had ever entered a judgment dismissing a case when it was not on the calendar and neither the defendant nor his attorney were present. Nor could she recall any judge paying the court costs for a defendant except Judge Peoples.

Mrs. Ruth C. Nelms, the Clerk of the Superior Court of Granville County, testified in brief summary as follows:

Judge Peoples held court, usually once a month in Granville, on a regular rotating schedule prepared by the Chief District Court Judge. No special file for him was maintained in Mrs. Nelms' office. However, when the State auditors came in July they found in the inactive file four pending cases which Judge Peoples had directed be placed there pending his further orders. This inactive file was maintained for cases in which the warrants had not been served. The defendants named in these warrants were usually escapees from the Department of Correction, the Youth Center at Butner, or other persons who could not be found but "needed to be tried." All Mrs. Nelms knew about the four cases in question was that Katherine West, the clerk who worked in the district court, told her that Judge Peoples had instructed her "to mark them that way." In each of these cases the warrant had been served upon the defendant.

In July 1977 the State auditor checked the record of the office of clerks of court in Vance, Franklin, and Granville Counties. They checked all the docketed cases, those which had been disposed of and those which were pending for trial. Mrs. Whitus testified, "they looked for everything, and that is how they came to locate the 'LTP File.' "

In September 1977 the State auditor reported to the Director of the Administrative Office of the Courts that there were discrepancies in records in the offices of the clerks in Vance, Franklin, and Granville Counties. In consequence James L. Glenn, Administrator, Clerk Services, was directed to investigate. In the course of his investigation he discovered the final disposition or the pending status of the cases listed in the five counts of the complaint and in the findings of fact by the Commission. After Mr. Glenn's investigation, Chief District Court Judge Claude W. Allen, Jr., directed that the 27 cases which had been pending in the Judge Peoples files in Vance County, the 18 in Franklin County; and the four cases retrieved from the inactive file in Granville County, be calendared for trial during the month of September at sessions over which he himself presided. In due course Judge Allen tried and disposed of all these cases.

In support of the allegations in Count I of the complaint — that Respondent dismissed three specified criminal cases out of court and without notice to the district attorney — Special Counsel offered the evidence summarized below.

Mrs. Longmire, Assistant Clerk of Court in Vance County, identified Vance County District Court file number 76 CR 835, *State of North Carolina v. Daniel McIntosh Briley.* In pertinent part, the record disclosed that on 12 February 1976 Daniel McIntosh Briley was arrested and charged with operating a motor vehicle upon a public highway while under the influence of intoxicating liquor. His breathalyzer test showed the alcoholic content of his blood to be .19 percent at the time. Thereafter he was released on his own unsecured bond of $200.00 and ordered to appear in court for trial on Friday, 5 March 1976. On 2 April 1976 (Friday) Judge Peoples signed a judgment in the case upon a form which showed the number of the case, 76 CR 835, the name of the defendant Briley and his attorney, and the charge. The disposition of the case was "Judgment of the court is that this case dismissed." The judgment sheet showed that no plea or verdict had been entered.

From other records of the District Court (Exhibits 4 and 5), Mrs. Longmire testified that on 2 April 1976 Chief District Court Judge Julius Banzet was holding the criminal term in Vance County; that the name Daniel McIntosh Briley did not appear on the court calendar (docket) for that day; and that the docket sheet showing the disposition of cases on 2 April 1976 did not contain the name Briley or the case numbered 76 CR 835. When asked if, to her knowledge, the case of *State v. Daniel McIntosh Briley,* 76 CR 835, appeared on any court calendar or minutes which she prepared, Mrs. Longmire answered, "I don't know."

Daniel McIntosh Briley, a car dealer in Henderson, North Carolina, testified that on 12 February 1976 he "was in a ditch" and was arrested for "driving under the influence." He was given an opportunity to call his lawyer, who came down and told Briley "to take it [breathalyzer test] and say no more." After that his attorney went with him to the magistrate and then took him home. Thereafter Briley never went to court and heard nothing further about his case until his attorney called to tell him Judge Peoples had dismissed the case.

Mrs. Whitus, courtroom clerk for the criminal session of Vance County, identified Special Counsel's Exhibit D as a duly certified copy of proceedings in Case No. 76 CR 1009, *State v. Louise Branham Catlett,* who had received a citation on 18 February 1976 for driving a motor vehicle at a speed of 50 MPH in a 35 MPH speed zone. The judgment sheet showed that Judge Peoples had disposed of this case on Monday, 19 July 1976, by signing the following entry: "Judgment of the court is that . . . case is dismissed by the court." The blocks on the judgment sheet provided for the entry of the defendant's plea (guilty, not guilty, or nolo contendere) were left blank. Mrs. Whitus testified that she herself entered and dated this judgment on the day Judge Peoples dismissed the case and that no court was held in Vance County on any Monday in July 1976. Criminal sessions were held on every Tuesday and Friday.

Mrs. Whitus also identified Exhibit E as a duly certified copy of the proceedings in Vance County District Court case No. 76 CR 1832, *State v. Harry Battle Riggan.* This record disclosed that on 26 February Riggan had received a citation for driving on the wrong side of the road and that his case was first set for 12 March 1976 and then continued until 9 April 1976. A notation on the shuck showed that sometime between March 12th and April 9th the case was put in Judge Peoples' file, and on Monday, 27 September 1976, Judge Peoples entered and signed the final judgment as follows: "The case is dismissed by the court."

Mrs. Whitus testified that she dated the judgment 27 September 1976, the day it was signed, and that no court was in session in Vance County on that day or on any other Monday in September 1976. As in the Briley and Catlett cases, the blanks provided on the judgment form to show the defendant's plea were unfilled.

Harry Battle Riggan, an employee of the North Carolina Department of Transportation testified that on 26 February 1976 a highway patrolman gave him a ticket for driving to the left of the center of the highway. Hoping to keep from losing a day's work because of going to court he took the ticket to his personal friend, James H. King, a Vance County magistrate. He gave King $25.00 in cash "to take care of the ticket . . . to answer for the ticket in [his] place." Thereafter Riggan never went to court or

heard anything further about the ticket until "maybe six months or a year" later when his wife told him his name "got in the paper for the ticket" that day. Sometime later Riggan could not say when Mr. King called to say, "I have some money for you; do you want it?" He knew King was talking about the twenty-five dollars. King was "taking [him] out for supper one Saturday night"; so he told King to keep it and they would use it then.

James H. King, who became a magistrate on 1 January 1974, testified that he is a personal friend of Riggan's and "he and I, we socialize." In late February 1976 Riggan brought King the ticket which a patrolman had given him for "driving left of the center line, while pulling a trailer." Riggan asked King if there was anything he could do to help him out on the ticket. King replied that he had known Judge Peoples for several years, considered him a friend, and he would see what he could do; that if "he could get him a prayer for judgment [continued], it would probably cost him the costs of court. At that time it was $25.00." Riggan gave him twenty-five dollars in cash. Thereafter King saw Judge Peoples, "explained the case to him," and told him he would "appreciate what he could do." Judge Peoples told King "he'd see what he could do, and that's all he said to [him]." King said it was his "understanding" that if Judge Peoples could or would "take care of that citation" he would be doing so as an accommodation to both him and Mr. Riggan. King did not give Judge Peoples the twenty-five dollars. Thereafter King heard nothing further about the case until Riggan asked him about it after he "saw it in the paper." When they discussed the twenty-five dollars Riggan "said he didn't want it back, [they] would just go out and eat it up."

Counts II, III, and IV of the complaint charge that in Vance, Franklin, and Granville Counties, Respondent, without notice to the district attorney, had pending cases removed from the active files of the district courts of the respective counties and caused them to be placed in a personal file with instructions to the court-room clerk to keep them in his file until he ordered them calendared or otherwise disposed of; that in consequence the administration of justice was delayed and the cases were not calendared or tried in open court in the regular course of business as provided by law. These cases were identified by name, file number, date and offense charged, and similarly listed in the Commission's findings of fact.

The cases specified in Count II are the 27 cases which Mr. Glenn found in the "LTP File" in the clerk's office in Vance County. In that group were six citations for speeding, two for driving after license revoked, one each for carrying a concealed weapon and an assault on a female, one for reckless driving, seven citations for relatively minor traffic offenses, and nine cases for driving under the influence of intoxicating liquor.

Of the nine cases of drunken driving two defendants had refused to take the breathalyzer test. On the other seven defendants the breathalyzer readings were .16% (2 cases), .17%, .18%, .19%, .24%, and .27%. The oldest of these cases (*State v. Hight,* 75 CR 702), (Exhibit 2A) had been pending since 2 February 1975—more than two years and seven months before it was calendared for trial before Judge Allen on September 1977 (at which time the defendant pled guilty as charged).

The most recent case of drunken driving in the "LTP File" (*State v. Shoemaker,* 77 CR 1883, Exhibit 2W) was filed 11 May 1977. In *State v. Thomas Jenkins Moore,* 77 CR 5097, Exhibit 2AA, driving under the influence, 10/16/76, the original trial date was 11/19/76. However, on the back of one of the forms in the certified copy of the court record of this case, the following handwritten, undated notation appears: "Lucy, put Tommy Moore's DUI case in my file. Linwood Peoples." Thus, this case lay dormant from 16 October 1976 until 23 September 1977 (11 months and one week) when Judge Allen disposed of the case upon the defendant's plea of guilty as charged.

The cases specified in Count III of the complaint are the four cases listed below, which Mrs. Nelms, the Clerk of the Superior Court of Granville County, delivered to Mr. Glenn in early September 1977 after the State auditors had discovered them in the inactive case files of the district court:

71 CR 4410 *State of North Carolina v. Harold Taylor Cottrell* Driving under the influence, breathalyzer reading .20%, 11/21/71

74 CR 3689 *State of North Carolina v. Virgil Lee Twisdale* Speeding 80 miles per hour in a 55 mile per hour zone 8/3/74

74 CR 4025 *State of North Carolina v. Jimmy Carl Knight* Speeding 70 miles per hour in a 55 mile per hour zone 8/16/74

74 CR 5227 *State of North Carolina v. Allen Ray Moody*
Speeding 69 miles per hour in a 55 mile per hour zone 10/8/74

The certified record in *State v. Cottrell,* 71 CR 4410, (Exhibit 8-A) showed that Cottrell was arrested for drunken driving and carrying a concealed weapon on 21 November 1971. He was released upon a bond with surety and his trial date set for 15 December 1971. On the judgment sheet, which showed no plea or verdict, the following information was typed: "December 15, 1971: Prayer for judgment continued until Judge Linwood T. Peoples orders case reopened." The sheet was signed by neither the judge nor the clerk.

The certified record in *State v. Twisdale,* 74 CR 3689 (Exhibit 8-B) shows this defendant was arrested on 3 August 1974 for speeding 80 MPH in a 55 MPH zone and directed to appear in court on 4 September 1974. It appears that he did not present himself for trial on that date, for a warrant was issued for his arrest. On 9 September 1974, the deputy clerk of court, Katherine K. West, mailed the warrant to the Sherriff of Vance County along with a letter informing him that Twisdale's bond had been set at $150.00 and his trial rescheduled for September 18th. He was not tried on that date, however. Among the papers certified as the record in this case are xerox copies of both an unsigned copy of the Clerk's letter to the Sheriff and a signed copy, which appears to be the Sheriff's original. At the bottom of this letter is the following handwritten notation: "Katherine, I'm sending this ticket but w/o bond. Set for 18th when I'm there again. Linwood T. Peoples." The record contains no warrant. An undated entry shows that the case "was placed on inactive docket until reinstated by Judge Linwood T. Peoples."

The record in *State v. Knight,* 74 CR 4025 (Exhibit 8-C) shows that this defendant was arrested on 16 August 1974 for speeding 70 MPH in a 55 MPH zone and his trial scheduled for 11 September 1974. It appears, however, that Knight — like Twisdale — did not go to court on the day cited, for on September 18th a warrant was issued for his arrest. The deputy clerk transmitted the warrant to the Sheriff of Vance County by a letter which informed him that Knight's trial had been rescheduled for September 25th and his bond set at $100.00. In the Knight file are both an unsigned and a signed copy of this letter but no war-

rant. The next dated entry is on the judgment sheet: "December 4, 1974: Case placed on inactive docket until reinstated by Judge Linwood T. Peoples."

The record in *State v. Moody*, 74 CR 5227 (Exhibit 8-D) shows that defendant was arrested on 8 October 1974 for speeding 69 MPH in a 55 MPH zone and cited to court on 30 October 1974. The shuck contains no warrants but entries on the shuck show that the case was rescheduled for trial on 20 November 1974 and then on 4 December 1974. Thereafter the shuck appears to have remained in the inactive file until 21 September 1977.

The foregoing four cases were calendared for trial by Chief District Court Judge Allen on 21 September 1977. At that time, upon presentation of a certificate showing the death of defendant Cottrell on 10 July 1974, he entered a judgment abating that action. The defendant Virgil Lee Twisdale was tried and found guilty of speeding 70 MPH in a 55 MPH zone and adjudged to pay a fine and costs. Defendant Jimmie Carl Knight was found guilty as charged and adjudged to pay a fine and costs. After defendant Allen Ray Moody was "called and failed" on 21 September 1977 and again on 28 December, the prosecutor believing "that the defendant cannot readily be found, dismissed the case with leave."

The cases specified in Count IV of the complaint are the 18 untried cases pending in Judge Peoples' file in Franklin County in July 1977, a list of which the clerk delivered to Mr. Glenn. In these cases were two charges of driving under the influence of intoxicating liquor, twelve of speeding, and one each of following too closely, improper passing, and driving to the left of the center. In one case, which had been pending since 28 August 1975, the warrant charged a felony and there had been no probable cause hearing. (This charge was dismissed by Judge Allen on 7 November 1977 when the State offered no evidence at the hearing.)

The oldest case pending in the Franklin County Judge Peoples File was *State of North Carolina v. Allen*, 75 CR 4165. The defendant Allen was charged with driving under the influence of intoxicating liquor on 8 September 1975. Of the remaining cases, eight had been filed in 1976 and eight in 1977. All these cases were calendared for trial before Judge Allen on 26

September 1977. The result was that all the misdemeanor cases were finally disposed of by pleas of guilty or verdicts of guilty except one speeding case in which the defendant, a member of the armed forces, was then overseas.

The charges in Count V are, in brief summary, that in each of three cases—*State v. Michael Thomas Smith,* 76 CR 5123, pending in Vance County; *State v. Arnold Sneed Walker,* 76 CR 5685, and *State v. Ronald Travis Hudson,* 77 CR 1324, both pending in Franklin County—Respondent represented to an emissary of each defendant that he would "take care of" traffic tickets he had received; that the emissary delivered to Respondent the defendant's copy of the citation and $27.00 (the court costs); that Respondent caused the defendant's case to be removed from the active pending files and placed in his personal "Judge Peoples Files," where the cases lay dormant until September 1977 when all cases in those files were calendared and disposed of by Chief Judge Allen; that Respondent returned the $27.00 to defendant Smith after his case was tried but he never returned the $27.00 to defendants Walker and Hudson. In the general audit, which the State auditor made of the offices of the clerks of court of Vance and Franklin Counties, these three cases were among those found in the Judge Peoples' personal file. The certified records and testimony pertaining to these cases tended to show:

In *State v. Michael Thomas Smith* the certified record (Exhibit 2-K) reveals that on 12 October 1976 Smith was arrested for speeding 70 MPH in a 55 MPH zone and was cited to court on 12 November. Smith and his friend Aubrey Eugene Lewis of Henderson testified that when Smith received his speeding ticket his concern for his driver's license caused him to discuss the matter with Lewis, who was also a friend of Judge Peoples. Lewis thought "he might could have something done about it"; so Smith gave him the ticket and he took it to Judge Peoples. Following Respondent's instructions, Lewis got a check for $27.00 from Smith and delivered it to Judge Peoples. In consequence Smith did not appear in court on 12 October 1976. Having dismissed the case from his mind he was taken by surprise when he was notified to appear in court on 23 September 1977. On the advice of Lewis he went to see Judge Peoples, who told him there was nothing he could do for him; that he would have to be tried. Upon his trial before Judge Allen, Smith was allowed to plead guilty to

exceeding a safe speed and was ordered to pay a fine of $25.00 and the costs. After the trial Judge Peoples refunded Smith the $27.00.

In *State v. Arnold Sneed Walker* the certified record (Exhibit 6-J) shows that on 3 November 1976 Walker was arrested for following another motor vehicle too closely and was cited to appear in court on 29 November 1976. The testimony of Mrs. Arnold Sneed Walker, the widow of defendant, and her nephew George Wesley Harris III, a police officer of the town of Henderson, tended to show:

Mr. and Mrs. Walker, residents of Henderson, thinking that Harris might handle the ticket sought his assistance. Mr. Walker, a truck driver, wanted to get a PJC (prayer for judgment continued) to protect his driver's license and to avoid losing a day's work on account of going to court. Harris, who knew Judge Peoples "pretty well," went to see him. Respondent told him he thought "he could do that for his uncle"; that he would be holding court in Franklin County and if Walker would send him the court costs he would clear it for Walker so that he wouldn't have to lose a day's work. Harris then procured from Mrs. Walker a check for $27.00 payable to himself. He cashed the check and gave the money, along with Walker's copy of the traffic citation, to Judge Peoples, whom he happened to encounter at a service station. In consequence of this transaction Walker did not appear in court on 29 November 1976.

The Walkers heard no more about the case until "one hot day during the summer of 1977" when the sheriff arrived with a warrant for Walker's "arrest following failure to appear as directed by citation." The warrant was not executed, however, because Mrs. Walker called Officer Harris, who talked to the sheriff. The sheriff then called Judge Peoples from the Walker home and Respondent told the sheriff "to bring the warrant down there the next morning . . . he would fix it the next morning." "By that," the Walkers "figured" Judge Peoples had forgotten the case and would take care of it the next morning, but on 14 September 1977 the sheriff notified Walker to be in court on September 26th for trial on that same ticket.

On Monday 26 September 1977 Walker, who was then ill, went to court in Louisburg. He pled guilty to the charge and

Chief District Court Judge Allen imposed a fine of $5.00 and the costs, which Walker paid. Upon his return home he showed Mrs. Walker the receipt and said, "Well, I reckon I've got a receipt for it this time." Mr. Walker died on the following Monday, October 2, 1977.

Mrs. Walker testified that she never got back the $27.00 she gave Harris to be delivered to Judge Peoples. Harris testified that to his knowledge Mr. Walker never received any money back from Judge Peoples although his uncle said he went and talked to Judge Peoples about the case before it was tried on Monday.

In *State v. Ronald Travis Hudson* the certified record (Exhibit 6-M) shows that defendant Hudson, a resident of Durham, was arrested in Franklin County for speeding 69 MPH in a 55 MPH zone and ordered to appear in court on 25 April 1977. His testimony and that of Richard B. Davis III tends to show:

Hudson requested his friend Richard Davis, who was a friend of Judge Peoples, to call the judge to see if he "could get the case deferred, or whatever." Davis made the call in Hudson's presence. At the conclusion of the call Davis told Hudson if he would give him $27.00 he would take it to Judge Peoples and, in return, Hudson would receive a PJC. Hudson gave Davis a check for $27.00, which he cashed. Davis put the money, together with Hudson's copy of his traffic ticket and a note thanking the judge for his assistance, in an envelope addressed to Judge Peoples. Then, in accordance with Respondent's instructions, he left the envelope at the judge's office with his secretary.

Hudson testified that about a month after he had given Davis the $27.00 a warrant was issued for his arrest for failure to appear in court. Upon the advice of Davis, Hudson contacted Judge Peoples, who apologized to him because his case had not been taken care of. Respondent "said he would send a letter to the Sheriff's Department stating that the matter was taken care of, and for [Davis] not to worry about it any more."

A certified copy of the proceedings in Case No. 77 CR 1324 (Exhibit 6-M) shows that on 25 April 1977 a "warrant for arrest following failure to appear as directed by citation" was issued for Hudson. The sheriff's return shows that the warrant was received on May 3rd but it was not executed because "recalled by District Ct."

On 16 September 1977 Hudson's April speeding ticket again came to his attention when a deputy sheriff notified him to appear in court on 26 September 1977. Once again Hudson contacted Judge Peoples. This time he was told to come by the Judge's office early in the morning of the day he had to go to court. Hudson testified that he kept the appointment, and Judge Peoples told him there was nothing he could do for him — "to go ahead and go to Court"; that he had contacted an attorney named Jolly, who would assist him. Hudson talked to Jolly who advised him to plead guilty. Hudson protested that he didn't want any points against his record because he was manager for an insurance company, but Jolly still advised him to plead guilty. Chief District Court Judge Allen fined him $10.00 and the costs, a total of $41.00, which he paid.

When Judge Peoples talked to Hudson on the morning of his trial he told him to tell Davis the amount of his fine and costs and he would "reimburse" Davis to reimburse Hudson. Judge Peoples also told Davis he would reimburse Hudson for his fine and costs. Davis told Hudson he had talked to Judge Peoples two times about the matter. Notwithstanding Davis has received no reimbursement.

On 13 April 1978, after reciting the jurisdictional facts and the chronology of proceedings prior to the hearing, which began on 31 March 1978, the Commission found facts and made conclusions of law as follows:

14. That at the hearing, Special Counsel for the Commission presented evidence which established the following additional facts:

(a) That on 12 February 1976 in the case *State of North Carolina v. Daniel McIntosh Briley,* Vance County file number 76Cr835, the defendant was arrested and charged with driving under the influence of intoxicating liquor; that a breathalyzer test was administered to the defendant and the test showed .19% blood alcohol content; that the court date appearing on the uniform citation no. C-2265415 is 5 March 1976 in Henderson, North Carolina; that the respondent entered the judgment "dismissed" in the case on 2 April 1976; that the defendant did not enter a plea in open court; that the respondent did not enter the judgment in an open

session of District Court; that the case does not appear on the criminal calendar or minutes for Vance County on 2 April 1976; that the respondent entered the judgment without notice and the approval of the District Attorney or his authorized assistant; that the respondent was not assigned by the Chief District Judge to preside at a session of court in any county in the Ninth Judicial District on 2 April 1976; that the defendant, Daniel McIntosh Briley, at no time appeared in court for the disposition of the case but was informed by his attorney that it had been dismissed.

(b) That in the case *State of North Carolina v. Louise Branham Catlett*, Vance County file number 76Cr1009, the defendant was charged with speeding 50 mph in a 30 mile per hour zone on 18 February 1976; that the court date appearing on the uniform citation no. C-2347185 is 19 March 1976 at Henderson, North Carolina; that the file envelope or "shuck" for the case had on it the notation "LTP file"; that the respondent entered the judgment "dismissed" in the case on 19 July 1976; that the defendant did not enter a plea or otherwise appear in the District Court with regard to the violation; that the respondent entered the judgment "dismissed" in the case on 19 July 1976 outside of open court and when the respondent was not assigned by the Chief District Judge of the District to preside over a session of District Criminal Court in Vance County as provided by law; that the District Attorney or his authorized assistant were not consulted or afforded the opportunity to present evidence in the case in open court as provided by law.

(c) That in the case *State of North Carolina v. Harry Battle Riggan*, Vance County file number 76Cr1322, the defendant was charged with "driving on the wrong side of the road" on 26 February 1976; that the court date appearing on the uniform citation no. 2185664 is 12 March 1976; that the file envelope or "shuck" indicated that the case was continued to 9 April 1976 and the notation "LTP file" appeared thereon; that the respondent entered the judgment "dismissed" in the case on 27 September 1976; that there was not a session of Criminal District Court held in Vance County on 27 September 1976; that the defendant at no time appeared in open court to enter a plea or otherwise attend the

disposition of the case; that the District Attorney or his authorized assistant were not consulted or afforded the opportunity to present evidence for the State.

(d) That the respondent maintained and caused to be maintained in the Vance County Office of the Clerk of Superior Court a "Judge Peoples" file; that the respondent caused certain criminal cases to be removed from the active pending files or docket of the Vance County District Court and instructed employees of the Vance County Clerk's office to include the files in the "Judge Peoples" file; that this action by the respondent resulted in the cases not being calendared and disposed of at an open session of court in the normal course of business in the Vance County District Court as provided by law; that the cases were not disposed of until September 1977 when Chief District Judge Claude W. Allen, Jr., of the Ninth Judicial District ordered the cases calendared for trial; that included in the "Judge Peoples" file in Vance County as late as September 1977 were the following cases:

| VANCE COUNTY FILE NUMBER | OFFENSE CHARGED |
|---|---|

75 CR 702    *State of North Carolina*
                   *v. Jeannette Robert Hight*
     Driving under the influence, refused breathalyzer 2/2/75

75 CR 4038    *State of North Carolina*
                   *v. Gregory Todd*
     Failing to stop at stop sign 6/27/75

75 CR 5767    *State of North Carolina*
                   *v. Joseph Gene Boyd*
     Driving under the influence, refused breathalyzer 10/2/75

75 CR 5921    *State of North Carolina*
                   *v. Anthony Reginal Franklin*
     Driving under the influence, breathalyzer reading .18%

75 CR 6924    *State of North Carolina*
                   *v. Bobby Gerrard Barbour*
     Driving under the influence, breathalyzer reading .16%
     12/4/75

76 CR 433    *State of North Carolina*
             *v. James Melvin Southerland*
    Careless and reckless driving 3/12/76

76 CR 1545    *State of North Carolina*
              *v. Richard Phillip Coorsh*
    Speeding 66 miles per hour in a 55 mile per hour zone
    4/2/76

76 CR 2531    *State of North Carolina*
              *v. Edward Stevenson*
    Assault on female 5/16/76

76 CR 2785    *State of North Carolina*
              *v. Frederick Brazil*
    No operator's license 6/11/76

76 CR 4436    *State of North Carolina*
              *v. William Edward Durham*
    Following another vehicle too closely and without due
    regard for the speed of vehicles and the traffic and the
    conditions of the highway 9/21/76

76 CR 5123    *State of North Carolina*
              *v. Michael Thomas Smith*
    Speeding 70 miles per hour in a 55 mile per hour zone
    11/12/76

76 CR 5190    *State of North Carolina*
              *v. Edward Thomas Williamson*
    Driving under the influence, breathalyzer reading .16%
    10/24/76

76 CR 5319    *State of North Carolina*
              *v. Garland Ray Ayscue*
    Driving under the influence, breathalyzer reading .24%
    10/30/76

76 CR 5423    *State of North Carolina*
              *v. Raymond Joseph Lilley*
    Driving while operator's license revoked 11/12/76

76 CR 5686    *State of North Carolina*
              *v. Allen Stotia Brown*

Failing to see movement could be made in safety 12/14/76

76 CR 5828    *State of North Carolina*
              *v. Thadeus John Cannon, Jr.*
Driving while operator's license revoked 1/21/77

76 CR 6016    *State of North Carolina*
              *v. Aquilla Brown, III*
Failing to secure a load 1/14/77

77 CR 74      *State of North Carolina*
              *v. Robert Wayne Morgan*
Speed greater than was reasonable under existing conditions 1/7/77

77 CR 173     *State of North Carolina*
              *v. Flora Walker Hester*
Speeding 48 miles per hour in a 35 mile per hour zone 1/21/77

77 CR 635     *State of North Carolina*
              *v. Juanita DeMent*
Speeding 60 miles per hour in a 45 mile per hour zone 3/4/77

77 CR 671     *State of North Carolina*
              *v. Ramona Jeffries Radford*
Speeding 48 miles per hour in a 35 mile per hour zone 3/15/77

77 CR 1269    *State of North Carolina*
              *v. Kenneth Rawls Stainback*
Passing another vehicle improperly 4/8/77

77 CR 1878    *State of North Carolina*
              *v. Claudette Shoemaker*
Possession of a concealed weapon 5/1/77

77 CR 1883    *State of North Carolina*
              *v. Claudette Shoemaker*
Driving under the influence, breathalyzer reading .27% 5/11/77

77 CR 2239    *State of North Carolina*
                   *v. Evelyn Northington*
    Driving under the influence, breathalyzer reading .19%
    and failure to yield right of way 5/24/77

77 CR 2240    *State of North Carolina*
                   *v. Evelyn Northington*
    Driving on the wrong side of highway 5/24/77

77 CR 5097    *State of North Carolina*
                   *v. Thomas Jenkins Moore*
    Driving under the influence, breathalyzer reading .17%
    10/16/77 (The certified record of this case (Ex 2AA)
    shows this date to be 10/16/76.)

(e) That the respondent instructed employees of the
Granville County Office of the Clerk of Superior Court to
remove certain cases from the active section of the Granville
County Criminal District Court files and place said case files
in the inactive section of the Granville County Criminal
District Court files; that as a result of the respondent's ac-
tions the cases were not calendared and disposed of at an
open session of Criminal District Court in the normal course
of business as provided by law; that the actions of the
respondent resulted in the cases not being disposed of as pro-
vided by law until Chief District Judge Claude W. Allen, Jr.
of the Ninth Judicial District ordered the cases calendared
for trial after receiving notice during September 1977 that
the cases had not been properly disposed of; that included in
the inactive section of the District Court criminal files in
Granville as late as September 1977 were the following
cases:

GRANVILLE COUNTY                              OFFENSE
FILE NUMBER                                   CHARGED

71 CR 4410    *State of North Carolina*
                   *v. Harold Taylor Cottrell*
    Driving under the influence, breathalyzer reading .20%
    11/21/71

74 CR 3689    *State of North Carolina*
                   *v. Virgil Lee Twisdale*

Speeding 80 miles per hour in a 55 mile per hour zone 8/3/74

74 CR 4025   *State of North Carolina*
                *v. Jimmy Carl Knight*
Speeding 70 miles per hour in a 55 mile per hour zone 8/16/74

74 CR 5227   *State of North Carolina*
                *v. Allen Ray Moody*
Speeding 69 miles per hour in a 55 mile per hour zone 10/8/74

(f) That the respondent instructed certain employees in the Office of the Franklin County Clerk of Superior Court to remove certain criminal cases from the active pending files and instructed that said case files be placed in a "Judge Peoples" manila folder file; that, as a result of this action by the respondent, the cases placed in the "Judge Peoples" file were not calendared and disposed of at an open session of Criminal District Court in Franklin County in the normal course of business as provided by law; that the cases were not disposed of as provided by law until Chief District Judge Claude W. Allen, Jr. of the Ninth Judicial District ordered the cases calendared for trial after receiving notice that the cases existed in the "Judge Peoples" file; that included in the "Judge Peoples" file in Franklin County as late as September 1977 were the following cases:

FRANKLIN COUNTY                          OFFENSE
FILE NUMBER                              CHARGED

75 CR 4165   *State of North Carolina*
                *v. Harold Thurston Allen*
Driving under the influence, no breathalyzer reading 8/9/75

76 CR 1751   *State of North Carolina*
                *v. Linvel Lee Nelson*
Speeding 69 miles per hour in a 55 mile per hour zone 4/4/76

76 CR 1893   *State of North Carolina*
                *v. Albert Jackson Ellis, Jr.*

Speeding 50 miles per hour in a 35 mile per hour zone
4/5/76

76 CR 2115    *State of North Carolina*
              *v. Eugene Allen Philyaw*
Speeding 65 miles per hour in a 55 mile per hour zone
4/9/76

76 CR 2138    *State of North Carolina*
              *v. Albert Jackson Ellis, Jr.*
Speeding 73 miles per hour in a 55 mile per hour zone
4/8/76

76 CR 3579    *State of North Carolina*
              *v. Kermit H. Merritt*
Intent to pass title to a 1966 Ford vehicle which he knew
or had reason to believe had been stolen (unlawfully tak-
en)—transfer possession of that vehicle to Danny Joe
Lindsey 8/28/75

76 CR 4130    *State of North Carolina*
              *v. Ollie Jackson Chaplin*
Improper passing 8/12/76

76 CR 4736    *State of North Carolina*
              *v. John Elton Woodlief*
Driving under the influence, no breathalyzer reading
9/26/76

76 CR 5447    *State of North Carolina*
              *v. Juan Edward Yeargan*
Speeding 65 miles per hour in a 55 mile per hour zone
10/27/76

76 CR 5685    *State of North Carolina*
              *v. Arnold Sneed Walker*
Following too close 11/3/76

77 CR 995     *State of North Carolina*
              *v. Jimmy Ray Ikner*
Speeding 66 miles per hour in a 55 mile per hour zone
4/12/77

In re Peoples

77 CR 1233   *State of North Carolina*
                  *v. Patricia Snipes Thompson*
             Speeding 68 miles per hour in a 55 mile per hour zone
             3/26/77

77 CR 1324   *State of North Carolina*
                  *v. Ronald Travis Hudson*
             Speeding 69 miles per hour in a 55 mile per hour zone
             4/1/77

77 CR 1532   *State of North Carolina*
                  *v. Shaun E. Edwards*
             Speeding 67 miles per hour in a 55 mile per hour zone
             4/18/77

77 CR 1588   *State of North Carolina*
                  *v. Waverly Lee Booker*
             Speeding 65 miles per hour in a 55 mile per hour zone
             4/12/77

77 CR 1631   *State of North Carolina*
                  *v. Dallas Bernard Hawkins*
             Exceeding safe speed 4/23/77

77 CR 1646   *State of North Carolina*
                  *v. Phillip Dean Pegram*
             Speeding 70 miles per hour in a 55 mile per hour zone
             4/24/77

77 CR 2040   *State of North Carolina*
                  *v. Jackson Wesley*
             Failing to drive on the right side of highway 5/24/77

(g) That on 12 October 1976 Michael Thomas Smith was charged with speeding 70 mph in a 55 mile per hour zone; that as a favor to Mr. Smith, Aubrey Eugene Lewis contacted the respondent and asked the respondent if there was anything respondent could do about the speeding ticket; that the respondent told Mr. Lewis to bring to him the $27.00 cost of court and he would take care of it; that Mr. Lewis obtained the $27.00 from Mr. Smith and delivered the $27.00 to the respondent; that the respondent removed or instructed an employee of the Vance County Office of the Clerk of Superior Court to remove from the active pending files in Vance Coun-

ty the case *State of North Carolina v. Michael Thomas Smith*, file no. 76Cr5123; that the respondent placed or instructed the case to be placed in a "Judge Peoples" file which was maintained in the Office of the Clerk of the Superior Court; that the file envelope or "shuck" displayed the notation "LTP"; that as a result of this action by the respondent the case was not disposed of in the normal course of business at an open session of the Vance County Criminal District Court until during September 1977 when Chief District Judge Claude W. Allen, Jr., ordered the cases contained in the "LTP" file calendared for trial; that the $27.00 was not returned by the respondent to the defendant Smith until the defendant was subpoenaed for the trial of the case during September 1977.

(h) That Arnold Sneed Walker was charged with "following too close" on 3 November 1976 in Franklin County in the case *State of North Carolina v. Arnold Sneed Walker*, file no. 76Cr5685; that as a favor to defendant Walker, George Wesley Harris, a police officer in the Henderson Police Department and a nephew of the defendant's wife, Emma Harris Walker, received a check for $27.00 for costs of court from Emma Harris Walker; that Mr. Harris cashed the $27.00 check and delivered $27.00 in cash to the respondent, who told Mr. Harris that he would enter a judgment of prayer for judgment continued or "PJC" in the case; that the respondent removed or instructed an employee of the Office of the Clerk of Superior Court of Franklin County to remove the Walker case file from the active pending files of the District Court and placed or instructed the case file to be placed in a special file maintained in the Franklin County Clerk's office; that the respondent did not dispose of the case in an open session of the Franklin County Criminal District Court and, in fact, no judgment was entered in the case until the existence of the special file was brought to the attention of Chief District Judge Claude W. Allen, Jr. and he ordered the cases contained in the file calendared for trial during September 1977; that the $27.00 received by the respondent from Mr. Harris was not returned to Mr. Harris or Mrs. Walker.

(i) That Ronald Travis Hudson was charged with speeding 69 mph. in a 55 mile per hour zone on 1 April 1977 in the case *State of North Carolina v. Ronald Travis Hudson*, Franklin County file no. 77Cr1324; that as a favor to defendant Hudson, Richard B. Davis consulted the respondent as to what could be done about the case; that the respondent informed Mr. Davis that it would be no problem and to bring him, the respondent, the pink copy of the uniform citation and $27.00 costs of court, and he, the respondent, would see that the defendant Hudson was given a prayer for judgment continued or "PJC"; that the defendant Hudson made out a personal check to Mr. Davis in the amount of $27.00 and Mr. Davis cashed the check and delivered the pink copy of the citation and the $27.00 cash to the respondent by leaving an envelope containing the citation and the cash along with a note thanking him for his assistance on the desk of a secretary as instructed by the respondent; that the respondent subsequently informed Mr. Davis that he, the respondent, had received the envelope and its contents and that he would take care of it; that the respondent removed or caused an employee of the Franklin County District Court to remove the case file from the active pending files of the Franklin County District Court and placed or instructed the case file to be placed in a special file folder maintained in the Office of the Clerk of Superior Court of Franklin County; that the respondent did not dispose of the case at an open session of the Franklin County District Court as provided by law and, in fact, no judgment or other disposition was made in the case until Chief District Judge Claude W. Allen, Jr. became aware of the existence of the special file and ordered the cases contained therein calendared for trial during September 1977; that the $27.00 was not returned by the respondent to the defendant Hudson or Mr. Davis.

15. That the findings of fact hereinbefore stated and the conclusions of law and recommendation which follow were concurred in by five (5) or more members of the Judicial Standards Commission.

## CONCLUSIONS OF LAW

16. As to the facts hereinbefore stated in paragraphs 14(a) through 14(i), each and every one of them, the Judicial

Standards Commission concludes on the basis of clear and convincing evidence that the actions of the respondent constitute wilful misconduct in office, and, conduct prejudicial to the administration of justice that brings the judicial office into disrepute, and in violation of the Canons of the North Carolina Code of Judicial Conduct.

## RECOMMENDATION

17. The Judicial Standards Commission of North Carolina recommends on the basis of hereinbefore stated findings of fact and conclusions of law that the Supreme Court of North Carolina remove the respondent from judicial office and that the respondent receive no retirement compensation and be disqualified from holding further judicial office as set out in North Carolina General Statutes Section 7A-376.

By Order of the Commission, this 13th day of April, 1978.

s / EDWARD B. CLARK
Chairman

(SEAL)

ATTEST:
s / MARVIN B. KOONCE, JR.
Secretary

In due course the Commission filed its "Findings of Fact, Conclusions of Law, and Recommendations" in this Court and thereafter Respondent timely requested a hearing on the recommendations.

At this point we take judicial notice that the records of the North Carolina State Board of Elections show the following:

On 1 February 1978 Linwood Thomas Peoples filed notice of his candidacy for election as the Superior Court judge in the Ninth Judicial District, subject to the Democratic Primary to be held on 2 May 1978. On 5 May 1978 he was certified by the State Board of Elections as the Democratic nominee for that position in the State-wide election to be held on 28 November 1978. There being no Republican or other candidate, on 28 November 1978 he

was certified as the duly elected judge of the Superior Court for the Ninth Judicial District.

*Harold D. Coley, Jr., Special Counsel for Judicial Standards Commission.*

*Bobby W. Rogers and Frank Banzet for respondent.*

SHARP, Chief Justice.

We consider first Respondent's contention that his resignation as a District Court Judge on 1 February 1978 deprived the Judicial Standards Commission of jurisdiction over "his person and the subject matter in this cause" as of that date and rendered the question of his removal moot. In support of this contention, Respondent points to the language of N.C. Gen. Stat. § 7A-376 (Cum. Supp. 1977), which reads in pertinent part as follows:

"Upon recommendation of the Commission, the Supreme Court may censure or remove any *justice or judge* for wilful misconduct in office. . . ." (Emphasis added.) It is upon this statute, enacted pursuant to N.C. Const., art. IV, § 17(2) that the jurisdiction of the Commission and this Court depends. Respondent argues (1) that from the time his resignation became effective he was no longer "a justice or judge" within the meaning of the statute, and (2) that since G.S. 7A-376 delimits the jurisdiction of both the Commission and this Court neither now has the power to discipline him. The Commission found no merit in these contentions and denied Respondent's motion to dismiss this proceeding. We affirm its ruling.

[1] It is quite true that "[w]here jurisdiction is statutory and the Legislature requires the Court to exercise its jurisdiction in a certain manner, to follow a certain procedure, or otherwise subjects the Court to certain limitations, an act of the Court beyond those limits is in excess of its jurisdiction." *Eudy v. Eudy*, 288 N.C. 71, 75, 215 S.E. 2d 782, 785 (1975). When a statute confers power on a court or administrative body to adjudicate cases involving the members of a certain class, a court's attempt to exercise its power over one who is not a member of that class is void for lack of jurisdiction. *See, e.g., Askew v. Leonard Tire Co.*, 264 N.C. 168, 141 S.E. 2d 280 (1965); *Aylor v. Barnes*, 242 N.C. 223, 87 S.E. 2d 269 (1955).

[2, 3]   However, the general rule is that the jurisdiction of a court depends upon the state of affairs existing at the time it is invoked. *Minneapolis & St. Louis Railroad Co. v. Peoria & Pekin Union Railway Co.*, 270 U.S. 580, 70 L.Ed. 743, 46 S.Ct. 402 (1926); *State v. Howell*, 107 Ariz. 300, 486 P. 2d 782 (1971); *Gardner v. Gardner*, 253 S.C. 296, 170 S.E. 2d 372 (1969). Jurisdiction over the person of a defendant or respondent is obtained by service of process upon him, by his voluntary appearance or consent. The jurisdiction of a court or administrative agency over the subject matter of a proceeding is derived from the law which organized the tribunal. Such jurisdiction, therefore, cannot be conferred upon a court by consent, waiver or estoppel. 3 Strong's North Carolina Index 3rd *Courts* § 2.1 (1976); 21 C.J.S. *Courts* § 28 (1940).

Assuming, without deciding, that Respondent is correct in his interpretation of the jurisdictional requirements of G.S. 7A-375, our first inquiry is when did the Commission acquire jurisdiction over the person of Respondent and what was "the state of affairs existing at that time."

On 1 December 1977 the Commission notified Judge Peoples that it had ordered a preliminary investigation of charges that he was guilty of misconduct in office by reason of the manner in which he was handling and disposing of criminal cases. On 30 January 1978—two days before the effective date of his resignation and in strict compliance with its Rule 8, the Commission notified Judge Peoples that formal proceedings had been instituted against him and advised him of his right to file an answer to the charges within 20 days. Along with that notice, Respondent was personally served with a copy of the verified complaint which specified "in ordinary and concise language" the charges against him.

It is apparent from the language of the Commission's Rule 8 that the verified complaint detailing the charges against a respondent and the "notice of formal proceedings" are intended to serve the same function as do the complaint and summons in a civil suit. Under Rule 3 of the Rules of Civil Procedure, N.C. Gen. Stat. § 1A-1, Rule 3 (1969), a civil action is commenced by the filing of a complaint. Upon the filing of the complaint, Rule 4 requires that summons shall be issued forthwith. Clearly, therefore,

on 30 January 1977, the Commission had jurisdiction of Respondent and the charges against him. Thus, we need not decide what result would have been reached had the complaint been filed after the effective date of Judge People's resignation. The question we must answer is what effect did Respondent's resignation two days later have on the jurisdiction of the Commission.

There is nothing in our law which prevents a judge or other public official from tendering his resignation during the pendency of removal proceedings against him. In *Rockingham County v. Luten Bridge Co.*, 35 F. 2d 301, 306 (4th Cir. 1929), 66 A.L.R. 735, 741 (a case dealing with the effect of the resignation of county commissioners in North Carolina) Judge John J. Parker said, "A public officer . . . has at common law the right to resign his office, provided his resignation is accepted by the proper authority. (Citations omitted.) And, in the absence of statute regulating the matter, his resignation should be tendered to the tribunal or officer having power to appoint his successor." Among the authorities cited for the foregoing statement are *Hoke v. Henderson*, 15 N.C. 1 (1833) and Annot., 19 A.L.R. 39 (1922).

[4] Decisions in the various jurisdictions are not in accord with reference to the right of a public official to resign and whether an acceptance is required. *See generally* 63 Am. Jur. 2d *Public Officers and Employees* §§ 162, 163 (1972); 46 Am. Jur. 2d *Judges* § 17 (1969); Annot., 82 A.L.R. 2d 750, 751 (1962). That issue, however, is not presented here since it is clear that, in his letter dated 20 January 1978, the Governor accepted Respondent's resignation as of 1 February 1978. When a resignation specifies the time at which it will take effect, the resignation is not complete until that date arrives. 46 Am. Jur. 2d, *Judges*, § 17 (1969). Thus, Respondent remained a District Court Judge until 1 February 1978, exercising all the powers of that office.

[6] From the facts outlined above, it is clear that the Judicial Standards Commission acquired jurisdiction of both the Respondent and the charges against him before he left office. The question whether the same result would be reached in a case where the complaint is filed after the effective date of a judge's resignation must await decision in a case which presents that issue.

The question we now consider is whether Respondent's resignation divested the Commission of jurisdiction or rendered

the question of his removal moot. We conclude that the Commission retained jurisdiction and that the question of removal was not rendered moot by. the resignation.

[5, 6]   Once the jurisdiction of a court or administrative agency attaches, the general rule is that it will not be ousted by subsequent events. This is true even when the events are of such a nature that they would have prevented jurisdiction from attaching in the first instance. *See* 20 Am. Jur. 2d *Courts* §§ 142, 148 (1965); 21 C.J.S. *Courts* § 93 (1940). "[O]nce jurisdiction of a court attaches it exists for all time until the cause is fully and completely determined." *Kinross-Wright v. Kinross-Wright*, 248 N.C. 1, 11, 102 S.E. 2d 469, 476 (1958). "Jurisdiction is not a light bulb which can be turned off or on during the course of the trial. Once a court acquires jurisdiction over an action it retains jurisdiction over that action throughout the proceeding. . . . If the converse of this were true, it would be within the power of the defendant to preserve or destroy jurisdiction of the court at his own whim." *Silver Surprize, Inc. v. Sunshine Mining Co.*, 74 Wash. 2d 519, 523, 445 P. 2d 334, 336-37 (1968). For other cases supporting the foregoing statement of the rule, *see Smith v. Campbell*, 450 F. 2d 829 (9th Cir. 1971); *United States Fidelity & Guaranty Co. v. Millers Mutual Fire Insurance Co. of Texas*, 396 F. 2d 569 (8th Cir. 1968); *Atlantic Corp. v. United States*, 311 F. 2d 907 (1st Cir. 1962); *State v. Howell*, 107 Ariz. 300, 486 P. 2d 782 (1971); *Sampsell v. Superior Court*, 32 Cal. 2d 763, 197 P. 2d 739 (1948); *Collins v. Robbins*, 147 Me. 163, 84 A. 2d 536 (1951); *Jones Drilling Co. v. Woodson*, 509 P. 2d 117 (Okl. 1973); *Silver Surprize, Inc. v. Sunshine Mining Co.*, 74 Wash. 2d 519, 445 P. 2d 334 (1968). Applying these principles to the instant case, it is apparent that both the Commission and this Court retained jurisdiction over the subject matter of this proceeding and the person of the Respondent after his resignation.

It is immaterial that Respondent, by reason of his resignation, was no longer a district court judge at the time the Commission filed its findings of fact and recommendation that he be removed from office with the Supreme Court. Respondent was a judge at the time the Commission filed its complaint against him and, as such he was clearly within its jurisdiction. Under G.S. 7A-376 there is but one disciplinary proceeding. It began when the Commission filed its complaint, and it will end with this

Court's final order. In proceedings authorized by G.S. 7A-376, this Court sits not as an appellate court but rather as a court of original jurisdiction. *In re Martin*, 295 N.C. 291, 245 S.E. 2d 766 (1978). "[T]he Commission can neither censure nor remove a judge. It is an administrative agency created as an arm of the court to conduct hearings for the purpose of aiding the Supreme Court in determining whether a judge is unfit or unsuitable. To that end, it is authorized to investigate complaints, hear evidence, find facts, and make a recommendation thereon." *In re Nowell*, 293 N.C. 235, 244, 237 S.E. 2d 246, 252 (1977). *Accord, In re Kelly*, 238 So. 2d 565 (Fla. 1970), *cert. denied* 401 U.S. 962 (1970).

[8]   In addition to the jurisdictional objections, which we have overruled, Respondent argues that the issues before the Commission and this Court were rendered moot by his resignation. That a court will not decide a "moot" case is recognized in virtually every American jurisdiction. D. Kates, Jr. and W. Barker, *Mootness in Judicial Proceedings: Toward a Coherent Theory*, 62 Calif. L. Rev. 1385, 1386 (1974). In federal courts the mootness doctrine is grounded primarily in the "case or controversy" requirement of Article III, Section 2 of the United States Constitution and has been labeled "jurisdictional" by the United States Supreme Court. *Liner v. Jafco, Inc.*, 375 U.S. 301, 11 L.Ed. 2d 347, 84 S.Ct. 391 (1964); *Utilities Commission v. Southern Bell Telephone Co.*, 289 N.C. 286, 289, 221 S.E. 2d 322, 324 (1975), 20 Am. Jur. 2d *Courts* § 81 (1965). In state courts the exclusion of moot questions from determination is not based on a lack of jurisdiction but rather represents a form of judicial restraint. *People ex rel. Wallace v. Labrenz*, 411 Ill. 618, 104 N.E. 2d 769, *cert. denied* 344 U.S. 824 (1952); *Overesch v. Campbell*, 95 Ohio App. 359, 119 N.E. 2d 848 (1953); *Ashmore v. Greater Greenville Sewer District*, 211 S.C. 77, 44 S.E. 2d 88 (1947); 20 Am. Jur. 2d *Courts* § 81 (1965); 62 Calif. L. Rev., *supra* at 1412.

[7]   Whenever, during the course of litigation it develops that the relief sought has been granted or that the questions originally in controversy between the parties are no longer at issue, the case should be dismissed, for courts will not entertain or proceed with a cause merely to determine abstract propositions of law. *Benvenue Parent-Teacher Association v. Nash County Board of Education*, 275 N.C. 675, 170 S.E. 2d 473 (1969); *Crew v. Thompson*, 266 N.C. 476, 146 S.E. 2d 471 (1966); *In re Assignment of*

*School Children*, 242 N.C. 500, 87 S.E. 2d 911 (1955); *Savage v. Kinston*, 238 N.C. 551, 78 S.E. 2d 318 (1953); 1 Strong's N.C. Index 3rd *Actions* § 3, *Appeal & Error* § 9 (1976).

Unlike the question of jurisdiction, the issue of mootness is not determined solely by examining facts in existence at the commencement of the action. If the issues before a court or administrative body become moot at any time during the course of the proceedings, the usual response should be to dismiss the action. *Allen v. Georgia*, 166 U.S. 138, 41 L.Ed. 949, 17 S.Ct. 525 (1897); *People ex rel. Wallace v. Labrenz*, 411 Ill. 618, 104 N.E. 2d 769, *cert. denied* 344 U.S. 824 (1952); 20 Am. Jur. 2d *Courts* § 81 (1965).

While so far as our research can determine the issue has never arisen in a hearing before a body such as our Judicial Standards Commission, the courts of other jurisdictions have considered the effect of a public official's resignation on a proceeding to remove him from office. If the only purpose of the proceeding is to vacate the office, it has been held that the proceeding becomes moot upon the incumbent's resignation. *People ex rel. Hill v. Muehe*, 114 Cal. App. 739, 300 P. 829 (Dist. Ct. App. 1931); *State v. Stine*, 200 Tenn. 561, 292 S.W. 2d 771 (1956); *State ex rel. Wilson v. Bush*, 141 Tenn. 229, 208 S.W. 607 (1919); *Skeen v. Paine*, 32 Utah 295, 90 P. 440 (1907); *Roberts v. Paull*, 50 W. Va. 528, 40 S.E. 470 (1901). *Cf., Hardy v. Albert*, 225 So. 2d 127 (La. App. 1969); *Layle v. Schnipke*, 384 Mich. 638, 186 N.W. 2d 559 (1971); *Meyer v. Strouse*, 422 Pa. 136, 221 A. 2d 191 (1966) (expiration of term of office renders removal proceeding moot).

But where the statute imposes sanctions in addition to ouster, the proceeding may be prosecuted to its conclusion despite the official's resignation. *State v. Rose*, 74 Kan. 262, 86 P. 296, *appeal dismissed*, 203 U.S. 580 (1906); *Hawkins v. Voisine*, 292 Mich. 357, 290 N.W. 827 (1940); *State ex rel. Childs v. Dart*, 57 Minn. 261, 59 N.W. 190 (1894); *State v. Wymore*, 345 Mo. 169, 132 S.W. 2d 979 (1939); *Attorney General ex rel. Robinson v. Johnson*, 63 N.H. 622, 7 A. 381 (1885); *People v. Harris*, 294 N.Y. 424, 63 N.E. 2d 17 (1945). *See also* 63 Am. Jur. 2d *Public Officers and Employees* § 162 (1972); 65 Am. Jur. 2d *Quo Warranto* § 102 (1972); 74 C.J.S. *Quo Warranto* § 23(b)(2) (1951).

In *State v. Rose*, supra, the Attorney General for the State of Kansas brought an action in *quo warranto* in the Supreme Court to oust the defendant as Mayor of Kansas City, on the ground that he had purposely violated the State liquor laws. After the trial was completed, but before the court issued its judgment, the city council accepted defendant's resignation.

Shortly after the judgment of ouster, a special election was called to fill the vacancy in the office of mayor. In defiance of the judgment, defendant ran for the office and was elected to serve the balance of his original term. When Rose was cited for contempt, his defense was that the court lacked the power to exclude him from office since he had voluntarily resigned and surrendered the office prior to judgment.

Noting that the purpose of the proceeding was not only to remove Rose from office but also to disqualify him for the remainder of his term, the court held that the proceeding had not been rendered moot by defendant's resignation and found defendant in contempt. It explained its conclusions as follows:

"The violations of law by the officer are not only public offenses but in committing them he forfeits his right to the office, and this forfeiture may be judicially declared in a *quo warranto* proceeding. The judgment cannot be deemed to be invalid because of the resignation of Rose just before its rendition. The issues were joined, testimony had been taken, and the case was ripe for trial before the resignation, and the defendant could not then, by surrendering the office divest the court of jurisdiction, nor thwart the purposes of the proceeding. The public had an interest in the action, and the judgment to be rendered was of no less consequence to it than to the individual interests of the defendant." 74 Kan. at 266, 86 P. at 297. *See also State v. Wymore*, 345 Mo. 169, 132 S.W. 2d 979 (1939).

The North Carolina courts have never considered the precise issue raised by the cases cited above. But we have considered a similar issue in the context of a license revocation hearing.

In *Elmore v. Lanier*, 270 N.C. 674, 155 S.E. 2d 114 (1967) the Commissioner of Insurance, acting under the authority of G.S. 58-42, notified plaintiff on 25 January 1967 that it was instituting a proceeding to revoke his license to sell insurance. The hearing

was set for February 13th, and at the hearing, plaintiff surrendered his insurance licenses, which expired on March 31. Plaintiff then obtained a preliminary injunction restraining the Commissioner from proceeding further with the hearing to revoke his license. Two days later the Wake Superior Court ordered the injunction dissolved and plaintiff appealed.

On appeal to the Supreme Court, plaintiff argued that his surrender of the licenses and their subsequent expiration rendered the cause moot. In rejecting this contention the Court observed that the proceeding under G.S. 58-42 served purposes in addition to revocation since the adjudication of the agent's wrongdoing would affect the subsequent issuance of a license. "With no adjudication of his wrongdoing, and upon the dismissal of these charges (solely because the petitioner, with whatever motive, reason or hope, has found it expedient to surrender his license), he could have substantial hope of regaining them within a comparatively short time. . . . While the agent in this kind of investigation may be presumed to be guiltless until his improper conduct has been formally proven, we must recognize that he would not be likely to close up his business, surrender his means of livelihood, and move his home unless he had substantial fear of the results of the investigation he is trying so desperately to prevent." 270 N.C. at 679, 155 S.E. 2d at 117.

[8] If G.S. 7A-376 limited the sanctions for wilful misconduct in office to censure or removal, Respondent's resignation would have rendered the proceedings moot. The statute, however, envisions not one but three remedies against a judge who engages in serious misconduct justifying his removal: loss of present office, disqualification from future judicial office, and loss of retirement benefits. Only the first of these was rendered moot by Respondent's resignation.

We must still decide whether Respondent's conduct would have merited his removal from office in order to determine whether these additional sanctions should be imposed. The resolution of that question is in no way affected by his resignation.

However, before discussing the Commission's findings of fact and conclusions, we are constrained to add that it would indeed be a travesty if a judge could avoid the full consequences of his misconduct by resigning from office after removal proceedings

had been brought against him. According to this argument, it would be possible for an involved judge, at any time before the Commission files its findings and recommendations with the Supreme Court, to bring the proceedings against him to a premature close by submitting his resignation to the Governor, who would accept it without knowledge that charges were pending against the judge. We are entirely convinced that the legislature never intended any such result, and that to interpret G.S. 7A-376 according to Respondent's contentions would emasculate the statute and thwart the legislative intent entirely.

In construing a statute the legislative intent is the all-important or controlling factor. " 'Indeed, it is frequently stated in effect that the intention of the legislature constitutes the law.' . . . If a strict literal interpretation of the language of a statute contravenes the manifest purpose of the Legislature, the reason and purpose of the law should control and the strict letter thereof should be disregarded." *In re Hardy*, 294 N.C. 90, 95, 240 S.E. 2d 367, 371 (1978). A statute will always be interpreted so as to avoid an absurd consequence, if possible, and a construction which will defeat its purpose will be avoided if that can reasonably be done without violence to the legislative language. *Ballard v. Charlotte*, 235 N.C. 464, 70 S.E. 2d 575 (1952).

We now consider the question whether the evidence adduced before the Commission with reference to Judge Peoples' conduct constitutes wilful misconduct in office, conduct prejudicial to the administration of justice, or both, and, if so, whether he should be removed or censured.

First, we conclude that the Commission's findings of fact are supported by clear and convincing evidence—the quantum of proof required to sustain the findings of the Commission. *In re Nowell*, 293 N.C. 235, 237 S.E. 2d 246 (1977). We therefore accept the Commission's findings and adopt them as our own. In addition, as bearing upon the truth of the findings, we point to the following facts:

Respondent filed no answer or other denial to the charges alleged against him in the complaint either before or after his special appearance and motion to dismiss were overruled. (It is perhaps noteworthy that when Respondent was notified of the date of the formal hearing, the Commission reminded him that he

had filed no answer to the charges alleged against him in the complaint.) Further, Respondent neither testified nor appeared in person at the hearing. Noting his absence, the Commission's chairman said to his counsel, "Mr. Boyce, we assume that the Respondent will not be present for the hearing?" Mr. Boyce replied, "That is his election, Mr. Chairman."

[9] It is only in criminal cases that the law decrees that the failure of the defendant to testify "shall create no presumption against him." In all other proceedings, it has long been the rule in this State that the failure of a party to take the stand to testify as to facts peculiarly within his knowledge and directly affecting him is "a pregnant circumstance" for the fact finder's consideration. *York v. York,* 212 N.C. 695, 701-702, 194 S.E. 486, 490 (1938). If the party is a competent witness, his failure to go upon the stand "when the case is such as to call for an explanation . . . or the evidence is such as to call for a denial," is a "circumstance against him" and a "proper subject of fair comment." *Cuthrell v. Greene,* 229 N.C. 475, 481-82, 50 S.E. 2d 525, 529 (1948). *See Smith v. Kappas,* 218 N.C. 758, 765, 12 S.E. 2d 693, 698 (1941); *Powell v. Strickland,* 163 N.C. 393, 402, 79 S.E. 872, 876 (1913); *Hudson v. Jordan,* 108 N.C. 10, 12-13, 12 S.E. 1029, 1030 (1891).

Surely no judge but one with a "substantial fear of the results of the investigation" would have made the elections and followed the course which respondent has taken in this case. We paraphrase the comment of Justice Walker with reference to the failure of the propounders of a will to testify in a caveat proceeding as follows: "We are at a loss to conceive why [Respondent] did not take the witness stand to refute the personal charges made against [him] unless [he] knew them to be true and unanswerable, or felt that [he] could not overcome the evidence of their truth offered by [Special Counsel], or did not wish to undergo the ordeal of a severe cross-examination. . . ." *In re Hinton,* 180 N.C. 206, 212-213, 104 S.E. 341, 344 (1920).

Finally we note that Respondent has brought forward on appeal no assignments of error challenging the Commission's findings of fact. Indeed, he took no exceptions to findings 14(b), (c), (g), and (i). As to findings 14(a), (d), (e), (f), and (h) he merely entered a formal objection, making no attempt to point out the basis for any objection. Since any exception which is not made the subject of

an assignment of error, and any assignment which is not brought forward on appeal and discussed in the appellant's brief, is deemed abandoned (App. R. 10(c)), this Court is entitled to assume that the facts found by the Commission are correct and, insofar as the facts are controlling, to determine the appeal in accordance with such findings. 1 Strong's North Carolina Index 3d *Appeal and Error* § 28.1 (1976).

In short summary, Respondent has never denied the charges against him nor contradicted the evidence presented to the Commission. Therefore it is with confidence in the accuracy of the Commission's findings that we proceed to determine whether, upon these findings, Judge Peoples has been guilty of wilful misconduct in office, conduct prejudicial to the administration of justice, or both.

Since 1 January 1973, the effective date of the act establishing the Judicial Standards Commission (1971 N.C. Sess. Laws, Ch. 590) seven cases,[1] including this one, have come to the Supreme Court upon the Commission's recommendation that disciplinary action be taken against a judge for "conduct prejudicial to the administration of justice that brings the judicial office into disrepute" or for both "wilful misconduct in office and conduct prejudicial to the administration of justice that brings the judicial office into disrepute." In the first five cases the Commission's recommendation was that the respondent be censured, and we viewed these cases in the light of that recommendation. In the fifth case, however, *In re Hardy*, 294 N.C. 90, 240 S.E. 2d 367 (1978), we concluded that G.S. 7A-376 and -377 empowered this Court, "unfettered in its adjudication by the recommendation of the Commission to make the final judgment whether to censure, remove, remand for further proceedings or dismiss the proceedings." *Id.* at 97-98, 240 S.E. 2d at 373. The opinion emphasized that "in the future the result in each case will be decided upon its own facts." *Id.* Although in the sixth case, *In re Martin*, 295 N.C. 291, 245 S.E. 2d 766 (1978), the Commission recommended the removal of the respondent for the reasons stated in the opinion, we declined to remove him. Thus, in each of the six cases

---

1. *In re Crutchfield*, 289 N.C. 597, 223 S.E. 2d 822 (1975); *In re Edens*, 290 N.C. 299, 226 S.E. 2d 5 (1976); *In re Stuhl*, 292 N.C. 379, 233 S.E. 2d 562 (1977); *In re Nowell*, 293 N.C. 235, 237 S.E. 2d 246 (1977); *In re Hardy*, 294 N.C. 90, 240 S.E. 2d 367 (1978); *In re Martin*, 295 N.C. 291, 245 S.E. 2d 766 (1978).

heretofore decided, the judgment of this Court has been that the respondent be censured.

As with every innovative enactment, the interpretation of G.S. 7A-376 and -377 evolves as these provisions are brought to bear upon the facts of a particular case. In the course of arriving at our decisions in the six cases which have come to us from the Commission, the following elementary principles of due process, judicial decorum, and the proper administration of justice have been repeatedly emphasized:

[10] 1. Any disposition of a case by a judge for reasons other than an honest appraisal of the facts and the law, as disclosed by the evidence presented, will amount to conduct prejudicial to the proper administration of justice. *In re Crutchfield*, 289 N.C. 597, 603, 223 S.E. 2d 822, 826 (1975).

[11] 2. The fact that a judge receives no personal benefit, financial or otherwise, from his improper handling of a case does not preclude his conduct from being prejudicial to the administration of justice. The determinative factors aside from the conduct itself, are the results of the conduct and the impact it might reasonably have upon knowledgeable observers. *Id.*

[12] 3. The trial and disposition of criminal cases is the public's business and ought to be conducted in open court. The public, and especially the parties, are entitled to see and hear what goes on in the court. *Id.*

[13] 4. A criminal prosecution is an adversary proceeding in which the district attorney as an advocate of the State's interest, is entitled to be present and be heard. Any disposition of a criminal case without notice to the district attorney who was prosecuting the docket when the matter was not on the printed calendar for disposition, improperly excluded the district attorney from participating in the disposition. *In re Edens*, 290 N.C. 299, 306, 226 S.E. 2d 5, 9 (1976).

[14] 5. "A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider *ex parte* or other communications concerning a pending or impending proceeding." *In re Stuhl*, 292 N.C. 379, 389, 233 S.E. 2d 562, 568 (1977).

In view of the publicity attendant upon this Court's censure of the six judges who have been recommended for discipline by the Judicial Standards Commission (the first censure having occurred on 17 December 1975) and the publication of the Court's opinions in these censure cases, no judge—be he lawyer or laymen, sensitive or insensitive to the proprieties—can justify his disposition of any case out of court. Nor can he justify disposing of a criminal case in court without the knowledge of the prosecuting attorney, for when he does so he purposely violates the duties of his office.

When we apply the principles enunciated and emphasized in the censure cases and the North Carolina Code of Judicial Conduct, 283 N.C. 771 (adopted in September 1973), to Respondent Peoples' conduct over a period of more than four years it appears beyond any reasonable doubt that Judge Peoples has repeatedly been guilty of wilful misconduct in office and conduct prejudicial to the administration of justice. The earliest record evidence of unlawful misuse of the powers of his judicial office by Judge Peoples is found in his handling of the case of Howard Taylor Cottrell, who was charged with driving while under the influence of an intoxicant on 21 November 1971 (breathalyzer reading .20%). This case was "pending" in Judge Peoples' personal file when defendant Cottrell died on 10 July 1974—more than three years after Respondent had caused it to be withdrawn from the active trial docket. It was among the cases which the auditors discovered during the general audit of July 1977.

Witnesses would give no estimate of the turnover in the Judge Peoples personal files, but counsel did elicit the information from the courtroom clerk in Vance County that "over a period of two or three years, cases were disposed of and new ones added." Another said that when the file got "cumbersome" she would urge him "to do something with some of the cases" and he would "from time to time make some disposition of them that would help cut the number back down." It was equally impossible for counsel to obtain any estimate of the number of cases in which Respondent entered judgment out of court and out of term, but it is implicit in the evidence that he did both routinely. The evidence also showed that "from time to time," after Respondent had entered judgment, he would deliver money to the clerk for the defendant's cost and fine. It is undenied that on two occasions

Respondent received money ($27.00) to pay a defendant's court costs for him after Respondent had disposed of his case; that Respondent neglected to dispose of the case and never paid the costs or returned the money to the defendant. In a third such case Respondent returned the money almost a year after receiving it and after another judge had disposed of the case.

[15]   It is no part of the business of a judge to receive and handle money to pay a defendant's court costs. A judge may not with propriety handle any financial transaction for a defendant (or any other party) which is incident to a case in which he sits in judgment. *A fortiori*, however, if a judge is indiscreet enough to take money for the purpose of paying a defendant's fine and costs he should forthwith pay it to the Clerk of the Court. Any use or retention of such funds, whether it be inadvertently, forgetfully, or because the judge is short of cash and intends to apply the money eventually to the purpose for which it was received, if not criminal — is wilful misconduct in office and conduct prejudicial to the administration of justice that brings the judicial office into disrepute.

[18]   To properly appraise Judge Peoples' judicial conduct we need only ask the question, "What would be the quality of justice and the reputation of the courts for dispensing impartial justice, if every judge kept a personal file and exercised the duties of his office like Judge Peoples?" Clearly Judge Peoples has been guilty of wilful misconduct in office and conduct prejudicial to the administration of justice that brings the judicial office into disrepute in that: (1) Respondent consistently and improperly precluded the district attorney from participating in the disposition of cases on which he was entitled to be heard in behalf of the State, and removed the disposition of cases from public view in open court by transacting the court's business in secrecy. (2) Respondent dismissed each of the three cases specified in the Commission's findings of fact No. 14(a), (b), (c) without a trial, in the absence of the defendant, without the knowledge of the district attorney, and on a day when the cases were not calendared for trial. (3) Respondent maintained a special file in the counties of Vance, Granville, and Franklin, as more fully set out in the Commission's findings of fact 14(d), (e), (f). He caused the clerk to remove certain cases from the active criminal docket and to be held in the files until he directed otherwise. In consequence

these cases were not tried speedily or calendared and disposed of in open court in the normal course of business in the district courts of the respective counties. (4) From time to time Respondent paid to the clerk money which he had collected from the defendants in cases which he disposed of in their absence; that in the two cases specified in the Commission's findings of fact 14(h) and (i), Respondent received $27.00 from each of two defendants for the purpose of paying his fine and costs when Respondent disposed of his case; that Respondent never "took care of the case," never paid the fine and costs and never returned the money; that in a third such case, he returned the $27.00 after keeping it eleven months.

The question we must now consider is whether Respondent should be censured or removed in accordance with the recommendation of the Commission. As Justice Branch pointed out in writing the opinion of the Court in *In re Martin*, 295 N.C. 291, 245 S.E. 2d 766 (1978), "[W]e have not previously adopted precise guidelines or standards for our determination of whether a judge or justice should be censured or whether he should be removed. Such strict guidelines should not be adopted since each case should be decided upon its own facts. *In re Hardy, supra.* Certainly where a judge's misconduct involves personal financial gain, moral turpitude or corruption, he should be removed from office. Further, if a judge knowingly and wilfully persists in indiscretions and misconduct which this Court has declared to be, or which under the circumstances he should know to be, acts which constitute wilful misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute, he should be removed from office. Unquestionably, any act by a judge or justice which is prejudicial to the administration of justice and brings the judicial office into disrepute warrants censure." *Id.* at 305-306, 245 S.E. 2d at 774-75.

[16, 17] We have heretofore attempted to define wilful misconduct and conduct prejudicial to the administration of justice in general terms. *See In re Nowell, supra* at 248, 237 S.E. 2d at 255, and *In re Edens*, 290 N.C. 299, 305-306, 226 S.E. 2d 5, 9 (1976). Like fraud, however, these terms are "so multiform" as to admit of no precise rules or definition. *Garrett v. Garrett*, 229 N.C. 290, 296, 49 S.E. 2d 643, 647 (1948). It suffices now to say that conduct prejudicial to the administration of justice, unless knowingly and

persistently repeated, is not per se as serious and reprehensible as wilful misconduct in office, which is a constitutional ground for impeachment and disqualification for public office. N. C. Const., art. IV, § 4, art. VI, § 8. Although we have not previously focused on this issue, we believe that a more careful distinction should henceforth be made between "wilful misconduct in office" and "conduct prejudicial to the administration of justice." A judge should be removed from office and disqualified from holding further judicial office only for the more serious offense of wilful misconduct in office.

A comparison of Judge Peoples' misconduct in the handling of cases over a period of years with the misconduct censured in *In re Crutchfield, In re Edens, In re Stuhl, In re Nowell, In re Hardy,* and *In re Martin* reveals some similarity, but it also reveals a vast difference in the number of cases each of those judges mishandled and the time during which his misconduct persisted. Judge Peoples' special files, which had certainly been maintained for more than three years and probably as long as seven years, contained 49 cases on the day the auditors discovered the files. Respondent's custom of rendering and entering judgments out of court and in the absence of both the defendant and the district attorney had become well-enough known to his friends and their acquaintances, so that they did not hesitate to seek his aid when confronted by a traffic ticket for speeding, a warrant for driving drunk, or any infraction by which their drivers license was threatened by either revocation or "points." Respondent's willingness to assist them with a "prayer for judgment continued" upon the payment of $27.00 for the fine and costs, or perhaps a dismissal in "a hard case," would surely cause the knowledgeable observer "to believe that Respondent was more interested in obtaining some personal advantage from his disposition of these cases in this manner than deciding them on their merits." Further, this is the first case we have considered in which there was any evidence that any judge had received money for costs or fines and had failed to apply it to the purpose for which the money had been received.

[18] We are therefore forced to the conclusion that Judge Peoples' repeated and purposeful misconduct and persistent indiscretions constitute wilful misconduct in office and require that he be officially removed from office.

[19]   Finally, we consider Respondent's contention that the provisions of G.S. 7A-376 which bar a judge who has been removed for misconduct from future judicial office are not authorized by Article IV, Section 17 (2) or by any other provision of the Constitution. We disagree.

Article IV, Section 17(2) of the North Carolina Constitution directs the General Assembly to "prescribe a procedure, in addition to impeachment and address . . . for the . . . censure and removal of a justice or judge of the General Court of Justice for wilful misconduct in office."

As the language of the amendment indicates, the purpose of the provision is not so much to change the consequences of removal as it is to provide a "*procedure in addition* to impeachment and address" which will accomplish the goals which formerly could be accomplished only through the cumbersome and antiquated machinery of impeachment. It "neither specifies a tribunal nor directs the creation of an authority for this purpose. It merely commands the legislature, in its discretion, to provide a new remedy as an adjunct to the cumbersome, ancient and impractical remedy of impeachment." *In re Martin*, 295 N.C. 291, 299, 245 S.E. 2d 766, 771 (1978).

In order to ascertain the meaning of this amendment to the Constitution, it is appropriate to consider it *in pari materia* with the other sections of our Constitution which it was intended to supplement. *Williamson v. City of High Point*, 213 N.C. 96, 195 S.E. 90 (1938); *Parvin v. Board of Commissioners*, 177 N.C. 508, 99 S.E. 432 (1919).

N. C. Const., art. IV, § 1 vests the judicial power of the State in the General Court of Justice and in a "Court for the Trial of Impeachments." Under Article IV, Section 4, the House of Representatives has the power of impeaching and the Senate serves as the "Court for The Trial of Impeachments." This constitutional provision does not specify the consequences which follow conviction but it does state that they "shall not extend beyond removal and disqualification to hold office." It adds, however, that a person who has been removed by impeachment is still "liable to indictment and punishment according to law."

In addition to impeachment, the Constitution provides for the removal of judicial officers "for mental or physicial incapacity by joint resolution of two-thirds of all the members of each house of the General Assembly." N. C. Const., art. IV, § 17(1). This process, which is termed "address," has been a part of our Constitution since 1835. When a justice or judge is removed for incapacity, this section imposes no sanction other than removal from office.

The removal of a judge or justice from office by either impeachment or address requires a two-thirds vote and places the legislature in the awkward position of sitting as a trier of fact, a role for which the courts and not the General Assembly are best suited. As a result, the machinery for impeachment and address has been seldom used. No judge has been removed by impeachment in this State pursuant to the Constitution of 1868. *See* North Carolina Courts Commission, Report of the Courts Commission to the General Assembly (1971); W. Clark, History of the Supreme Court of North Carolina, 177 N.C. 617, 619 (1919). The joint resolution procedure, while limited to disability cases, is even less effective. It apparently has never been used in North Carolina. Report of the Courts Commission, *supra* at 20.

Recognizing the need for a better method of removal, the General Assembly, following the lead of many of our sister states, submitted Article IV, Section 17(2) as a constitutional amendment authorizing an "[a]dditional *method* of removal of Judges." (Emphasis added.) This amendment was approved by the people in an election held on November 7, 1972.

The sections of the Constitution providing for the removal of judges by impeachment or joint resolution make a careful distinction between judges removed for misconduct and those removed for "mental or physical incapacity." In following the constitutional mandate to "prescribe a procedure in addition to impeachment and address," the legislature made the same distinction in G.S. 7A-376. When a judge is removed for "mental or physical incapacity" upon the recommendation of the Judicial Standards Commission, the remedy allowed by statute is limited to removal from office. On the other hand, when a judge is removed for reasons other than incapacity, G.S. 7A-376 (like the impeachment provision it was intended to supplement), provides for both removal

and disqualification from future judicial office. A proceeding instituted by the Judicial Standards Commission, like a removal proceeding under Article IV, § 4, is neither civil nor criminal in nature. *In re Nowell*, 293 N.C. 235, 241, 237 S.E. 2d 246, 250 (1977). A judge removed by impeachment or by the Supreme Court pursuant to the recommendation of the Commission may still be prosecuted in a criminal court.

In addition to the sanctions which follow removal by impeachment (loss of office and disqualification to hold further judicial office), G.S. 7A-376 imposes an additional sanction, the loss of retirement benefits.

[20]   The constitutional source for this remedy does not lie in the impeachment provisions of Article IV, Section 4, but in Section 8 of that same Article, which gives the General Assembly the power to "provide by general law for the retirement of Justices and Judges." Under this power the General Assembly may condition retirement benefits upon good conduct in office. Thus it acted well within its constitutional authority when it provided in G.S. 7A-376, that a judge who is removed from office for cause other than mental or physical incapacity shall receive no retirement compensation. This does not mean, of course, that he forfeits his right to recover the contributions which he had paid into the fund. G.S. 135-62 (1974).

Respondent states correctly that the scope of removal proceedings under G.S. 7A-376 cannot be broader than the constitutional amendment which authorized the General Assembly to set up a procedure for the removal and censure of judges. He then asserts that in providing for both disqualification to hold future judicial office and loss of retirement benefits under G.S. 7A-376 the General Assembly exceeded the authority granted it by Article IV, Section 17(2) of the Constitution since that provision speaks only of the "censure and removal of a Justice or Judge."

As we have already noted, this amendment must be read in connection with the impeachment provisions of Article IV, which it was intended to supplement. These provisions clearly provide for the disqualification of a judge who has been removed for misconduct. Nevertheless, we will address Respondent's argument.

Questions of constitutional construction are in the main governed by the same general principles which control the meaning of all written instruments. *Perry v. Stancil*, 237 N.C. 442, 75 S.E. 2d 512 (1953). The fundamental principle of constitutional construction must be to give effect to the intent of the framers and of the people adopting it. *State v. Emery*, 224 N.C. 581, 31 S.E. 2d 858 (1944); *Reade v. City of Durham*, 173 N.C. 668, 92 S.E. 712 (1917). Where possible amendments to the Constitution should be given a practical interpretation which will carry out the plainly manifested purpose of those who created them. 16 Am. Jur. 2d *Constitutional Law* § 65 (1964).

In ascertaining the intent of the framers, the Court should look at "conditions as they then existed and the purpose sought to be accomplished. Inquiry should be directed to the old law, the mischief, and the remedy. The Court should place itself as nearly as possible in the position of the men who framed the instrument." *Perry v. Stancil*, 237 N.C. 442, 444, 75 S.E. 2d 512, 514 (1953).

In our view the driving force behind the creation of the Judicial Standards Commission was the need for a workable alternative to the cumbersome machinery of impeachment. *See* North Carolina Courts Commission, Report of the Courts Commission to the General Assembly (1971). Disqualification from office has long accompanied removal for misconduct under the impeachment provisions of both the state and federal constitutions. *See, e.g.*, N.C. Const. of 1835, Art. 3, § 1. We do not believe that the legislature misconstrued the spirit of the amendment when it attached this same consequence to removal proceedings under G.S. 7A-376. The drafters of the impeachment provisions of the Constitution recognized that the removal of a public official for wilful misconduct in office without disqualifying him from future office might well be a futile gesture. In the absence of such a provision a judge who had been removed for wilful misconduct in office could not only run for election to fill out the term from which he had been removed but also — as here — seek higher judicial office. Such an event would obviously thwart the purpose of the removal proceedings, which is to protect the public from unfit public officials.

The "mischief" to be cured by Article IV, Section 17(2) was the *inefficiency* of removal proceedings under the impeachment and address provisions of our Constitution, not the remedies.

This view is supported by the interpretation placed upon Article IV, Section 17(2) by the legislature which framed the amendment. Both G.S. 7A-376 and the constitutional amendment authorizing this legislation were conceived and ratified together. Both bills were enacted by the General Assembly within three days of each other in June 1971. 1971 N.C. Sess. Laws, ch. 560, 590. The statute by its terms was to become effective on January 1, 1973 provided the voters of the State approved the amendment to Article IV, Section 17 of the Constitution. 1971 N.C. Sess. Laws, ch. 560, § 3.

Clearly the legislature believed that the disqualification provisions of the statute were authorized by the terms of the constitutional amendment, for no purpose would be served by passing a constitutional amendment which was not as broad as the statute it was intended to implement.

This legislative construction, while not conclusive, should be given considerable weight. *Wilson v. City of High Point*, 238 N.C. 14, 76 S.E. 2d 546 (1953); *Purser v. Ledbetter*, 227 N.C. 1, 40 S.E. 2d 702 (1946); *Reade v. City of Durham*, 173 N.C. 668, 92 S.E. 712 (1917); *Chadbourn Sash, Door & Blind Co. v. Parker*, 153 N.C. 130, 69 S.E. 1 (1910). This is particularly true where, as in this case, the statute construing the Constitution was enacted by the very legislature which conceived and submitted the constitutional amendment.

As this Court said when faced with a similar situation in *Trustees of the University of North Carolina v. McIver*, 72 N.C. 76, 83 (1875):

"[W]e find that the very legislative body which adopted this amendment and was conversant with its meaning, immediately upon its ratification, passed the act we are now construing, and provided therein for the election of trustees as they were elected before the war. Thus the very legislative body which drafted the constitutional amendment, gave a legislative construction of the meaning of its terms. This interpretation . . . is entitled to peculiar respect."

[19] We hold that N.C. Const., art. IV, § 17(2) authorizes the General Assembly to disqualify from holding further judicial of-

fice a justice or judge who has been removed for causes other than mental or physical disability.

As an alternative ground for our holding that the North Carolina Constitution authorizes the General Assembly to prescribe disqualification from office as a consequence of removal under G.S. 7A-376, we note the language of Article VI, Section 8 of the Constitution, which provides as follows:

"Sec. 8. *Disqualifications for office.* The following persons shall be disqualified for office:

"First, any person who shall deny the being of Almighty God.

"Second, with respect to any office that is filled by election by the people, any person who is not qualified to vote in an election for that office.

"Third, any person who has been adjudged guilty of treason or any other felony against this State or the United States, or any person who has been adjudged guilty of a felony in another state that also would be a felony if it had been committed in this State, or *any person who has been adjudged guilty of corruption or malpractice in any office,* or any person who has been removed by impeachment from any office, and who has not been restored to the rights of citizenship in the manner prescribed by law." (Emphasis added.)

N.C. Const., art. VI, § 8 has a long and complicated history. *See generally* Coates, *Punishment for Crime in North Carolina,* 17 N.C.L. Rev. 205, 206-208 (1939). It made its first appearance in the Constitution of 1868, which provided in pertinent part as follows:

"Sec. 5. The following classes of persons shall be disqualified for office: First, All persons who shall deny the being of Almighty God. Second, All persons who shall have been *convicted* of treason, perjury or of any other infamous crime . . . or of corruption, or malpractice in office." (Emphasis added.) N.C. Const. of 1868, art. VI, § 5.

The Constitution of 1868 likewise prohibited any person who engaged in dueling from holding office. N.C. Const. of 1868, art. XIV, § 2. Conviction as a prerequisite to disqualification under this section was not required.

In 1902 the disqualification provision of the Constitution was amended to include not only persons convicted of crimes but also those who "confessed their guilt on indictment pending, and whether sentenced or not, or under judgment suspended, of any treason or felony . . . or of corruption or malpractice in office." N.C. Const. of 1876, art. VI, § 8 (1902), 1900 Laws of N.C., ch. 2 §§ 8, 9.

In the few cases which have considered the issue, the courts have agreed that the term "convicted," when used in a provision making "conviction" of a crime a cause of disqualification to hold office, means conviction in a criminal court of law. *State ex rel. White v. Mills*, 99 Conn. 217, 121 A. 561 (1923) (term "convicted" used in city charter); *Lovely v. Cockrell*, 237 Ky. 547, 35 S.W. 2d 891 (1931) (statute); *Coco v. Jones*, 154 La. 124, 97 So. 337 (1923) (constitutional provision); *State v. Henderson*, 166 Miss. 530, 146 So. 456 (1933) (constitutional provision); Annot., 71 A.L.R. 2d 593, 595 (1960); 63 Am. Jur. 2d *Public Officers and Employees* § 196 (1972).

The present language of Article VI, Section 8, was introduced as part of a major revision of the North Carolina Constitution in 1971. That revision extended the bar against office holding to persons found guilty of committing a felony against the United States or another state and substituted the phrase "adjudged guilty" for the term "convicted." N.C. Const., art. VI, § 8; 1969 N.C. Sess. Laws, ch. 1258. *See also* Report of the N.C. State Constitution Study Commission (1968).

In its present form, this provision of our Constitution disqualifies from office "any person who has been adjudged guilty of corruption or malpractice in any office." The word *adjudged* means "to decide or rule upon as a judge or with judicial or quasi-judicial powers." Webster's Third New International Dictionary (1961). The word *guilty* connotes evil, intentional wrongdoing and refers to conscious and culpable acts; it does not necessarily mean or require criminal conviction or the finding of a jury. 39 C.J.S. *Guilty*, p. 448 (1976). Certainly these definitions are broad enough to encompass an adjudication by this Court, pursuant to the provisions of G.S. 7A-376, that a judge is guilty of wilful misconduct in office.

We conclude that the substitution of the term "adjudged guilty" for the term "convicted" permits the General Assembly to prescribe proceedings in addition to criminal trials in which an adjudication of guilt will result in disqualification from office. Pursuant to that authorization, the legislature enacted G.S. 7A-376, barring a judge 'from future judicial office when he has been removed by this Court for wilful misconduct in office. Since disqualification is a serious penalty it can be constitutionally imposed only when the adjudication of guilt meets the fundamental requirements of due process.

An adjudication of guilt under the provisions of G.S. 7A-376 meets the requirements of due process. The judge's misconduct must be proved by "clear and convincing evidence." *In re Nowell*, 293 N.C. 235, 237 S.E. 2d 246 (1977).

Under rules adopted by the Judicial Standards Commission, a judge is entitled to notice of the charges against him and must be personally served with process. Rules of the Judicial Standards Commission, Rule 8. The judge must be given the "opportunity to defend against the charges by introduction of evidence, representation by counsel, and examination and cross-examination of witnesses." Rules of the Judicial Standards Commission, Rule 13. He also has the right to issue subpoenas for the attendance of witnesses or the production of documents. Rule 13, supra.

[19] We hold that an adjudication of "wilful misconduct in office" by this Court in a proceeding instituted by the Judicial Standards Commission in which the judge or justice involved has been accorded due process of law and his guilt established by "clear and convincing evidence," is equivalent to an adjudication of guilt of "malpractice in any office" as used in N.C. Const., art. VI, § 8. We conclude, therefore, that the legislature acted within its power when it made disqualification from judicial office a consequence of removal for wilful misconduct under G.S. 7A-376.

For the reasons enunciated in this opinion it is ordered by the Supreme Court of North Carolina, in conference on 29 December 1978, that Respondent Linwood Taylor Peoples be and he is hereby officially removed from office as a judge in the General Court of Justice, District Court Division, Ninth Judicial District, for the wilful misconduct in office specified in the find-

ings of fact made by the North Carolina Judicial Standards Commission, which findings the Court has adopted as its own.

In consequence of his removal, Respondent is disqualified from holding further judicial office and is, therefore, ineligible to take the oath of office as the resident Superior Court Judge of the Ninth Judicial District, the office to which he was elected on 7 November 1978 and certified by the State Board of Elections on 28 November 1978. For the same reason he is ineligible for retirement benefits.