WOODALL, Justice.
M. John Steensland, Jr., a retired district judge in Houston County, appeals from a judgment of the Alabama Court of the Judiciary (“the COJ”) that publicly censured him for judicial misconduct that preceded his retirement. We affirm.

I. Factual and Procedural Background

Judge Steensland first assumed his duties as a district judge in Houston County in 1989. On January 20, 2009, he began to serve the six-year term to which he was elected in November 2008. Subsequently, the Alabama Judicial Inquiry Commission (“the JIC”) began an investigation based upon complaints against Judge Steensland filed by (1) Stacie R., (2) Julie M„ (3) Natasha H., and (4) Cynthia M., regarding Judge Steensland’s courtroom conduct and demeanor. On May 7, 2010, while the JIC’s investigation was ongoing, Judge Steensland voluntarily retired from his office.
On December 14, 2010, the JIC filed a complaint in the COJ charging Judge Steensland with violations of various of the Canons of Judicial Ethics. The complaint contained 7 “counts” and 60 accompanying “charges.” Counts 1 and 2, which included charges 1 to 15, arose out of the allegations by Stacie R. Count 3, which included charges 16 to 25, arose out of the allegations made by Julie M. Count 4 and the accompanying charges 26 to 35 arose out of the allegations of Natasha H. and Cynthia M. Count 5, which included charges 36 to 46, pertained to incidents and conduct that occurred in 2007 and was unrelated to the named complainants. Count 6 included charges 47 to 56 and involved incidents and conduct that occurred before January 2009, which charges were expressly described as “exhibiting] a ‘pattern and practice’ ” of conduct violative of certain Canons. Count 7, with charges 57 to 60, also involved some incidents and conduct that occurred before January 2009 and did not involve the named complainants.
On March 1, 2011, Judge Steensland moved to dismiss the complaint, arguing, among other things, (1) that the JIC “had no jurisdiction over [him] on the date of the filing of this Complaint, December 14, 2010”; and (2) that some of the charges were “barred by the doctrine of condonation in that the alleged acts complained of occurred” before the commencement of his last term of office, i.e., before January 20, 2009. After a hearing held on March 3, 2011, the COJ denied Judge Steensland’s motion to dismiss.
On April 18, 2011, Judge Steensland sent a letter to the chief judge of the COJ. That letter stated, in pertinent part:
“On May 7, 2010, after more than twenty-one years of service as District Judge of Houston County, I retired from the bench and have been on retired-inactive status since that time. This letter serves as official written notice to you that it is my intent to remain inactive. Accordingly, any request, whether now or in the future, that I return to active duty status, or exercise any judicial authority, is hereby declined.”
The case against Judge Steensland proceeded to trial. Following the trial, the COJ issued the following “final judgment and public censure”:
“On December 14, 2010, [the JIC] filed a complaint with [the COJ] charging M. John Steensland, Jr., with violating the Canons of Judicial Ethics (‘the *537 Canons’), while presiding over court proceedings in his capacity as a district judge in Houston County. Based on the testimony presented at trial, this court hereby finds as follows:
“On January 5, 2010, Judge Steens-land held a docket to hear traffic cases. Stacie R. had received a ticket for simple speeding and was the first person to appear before Judge Steensland that day. She entered a plea of ‘not guilty’ and requested a trial on the speeding charge. Evidence was then presented in her case, after which Judge Steens-land found Ms. R. guilty and sentenced her to ten days in jail. Ms. R. testified before this court that, after Judge Steensland pronounced sentence, she was handcuffed and was made to sit in a chair along the wall toward the front of the courtroom.
“Ms. R. testified that after she was handcuffed she explained to Judge Steensland that she was a veteran of the Iraq war, that she had been injured while serving in Iraq, and that she suffered from post-traumatic stress disorder. Because of her injuries and her disorder, Ms. R. explained, she could not endure being handcuffed. Nonetheless, she said, she remained in handcuffs throughout the approximately two hours of that court session. During that time, Ms. R. testified, she was crying and shaking, and, at one point, it appeared as though she was about to hyperventilate. Ms. R. stated that, in an effort to calm her, courtroom personnel told her that Judge Steensland would release her at the end of the docket and that she would not actually be going to jail.
“According to testimony from a number of witnesses, as other defendants came forward at the session of court to enter their pleas in traffic cases, Judge Steensland would ask whether they wanted to plead guilty or ‘end up’ like Ms. R. No other defendant requested a trial during the traffic-case docket that day. At the end of the docket, Judge Steensland set aside Ms. R.’s sentence and ordered her to pay a fine of $50 plus costs.
“On the same day Ms. R. was in Judge Steensland’s courtroom, Julie M., whose teenage son had received a ticket for speeding and a ticket for failing to have proof of automobile insurance, accompanied her son to court. They attended the session of court during which Ms. R. was handcuffed and made to sit at the front of the courtroom. Ms. M. testified that, throughout the court session, Judge Steensland appeared to be angry and was yelling and cursing from the bench. Her son had intended to seek youthful-offender status, but, Ms. M. said, in light of Judge Steensland’s demeanor and his treatment of Ms. R., her son chose to plead guilty instead. Ms. M. testified that she told Judge Steensland that her son was pleading guilty only because Judge Steensland was ‘too angry.’ Judge Steensland then called the attention of the people in the courtroom to her son because, Ms. M. said, Judge Steensland said that her son was doing the ‘smart’ thing by pleading guilty.
“Another litigant [Natasha H.] testified that, in November 2009, she appeared before Judge Steensland regarding a domestic complaint she had filed against her husband. That litigant testified that she suffered from a medical disorder that affected her short-term memory. When she was unable to remember details of the complaint she had filed against her husband, she said, Judge Steensland became angry and told her that she was going to go to jail. Although she was not charged with an offense, that litigant was placed in hand *538 cuffs and was taken to jail. Because she had not been charged, no bond had been set, and she spent the night in jail. She was not released until late in the afternoon the following day.
“That same day in November 2009, Cynthia M. appeared before Judge Steensland in a matter involving her daughter, which had arisen approximately two years earlier. Ms. M. testified that she believed that she and her daughter were going to court for a hearing on whether her daughter was to lose her pretrial-diversion status. Instead, when they appeared before Judge Steensland, they learned that there was to be a trial.
“Ms. M. testified that before her daughter’s case was called for trial, Judge Steensland was yelling and cursing from the bench and that she had seen a litigant handcuffed and ordered to jail because she was unable to remember some details of her case. Ms. M. stated that she was terrified, because, like the previous litigant, she suffered from a medical condition that affected her memory. When her daughter’s case was called, Ms. M. said, she told Judge Steensland that she would have to go to jail because she could not remember everything that had occurred. According to Ms. M., Judge Steensland told her that she ‘needed to get her d--n memory back.’ He then told Ms. M.’s daughter that she had to plead guilty to keep her mother from going to jail. Ms. M., who stated that she was crying while she was before Judge Steensland, testified that she told Judge Steensland that she did not believe her daughter should have to plead guilty because she could not remember what had happened. She said that Judge Steensland then ordered her' to jail and had her handcuffed. Although she was held in the jail overnight, Ms. M. said, she was not charged and no bond was set. She stated that her husband hired an attorney and that the next day another judge released her from jail after finding that no arrest warrant had been issued for her.
“This court finds that in addition to the specific incidents set forth above, Judge Steensland often used profanity and yelled at litigants from the bench. In his capacity as a district judge, Judge Steensland would demean, mock, and humiliate the litigants, both defendants and complaining witnesses who appeared before him, especially when the litigants were appearing pro se. On a number of occasions, Judge Steensland asked victims of domestic abuse what they hade done to cause the abuse. Judge Steensland also made a practice of sentencing to jail defendants who appeared before him early in the docket and who pleaded ‘not guilty’ and requested a trial. The sentences in those cases were imposed in bad faith in an effort to discourage other defendants from seeking a trial. Judge Steens-land’s conduct is without reasonable excuse or justification.
“On the basis of the evidence presented, not all of which is set out herein, this court finds that the JIC proved by clear and convincing evidence that Judge Steensland is guilty of violating the following Canons of Judicial Ethics:
“• Canon 1, by failing to observe high standards of conduct that would preserve the integrity and independence of the judiciary;
“• Canon 2, by failing to avoid impropriety and the appearance of impropriety in all of his activities, specifically, by failing to respect and to comply with the law, and by failing to conduct himself at all times in a manner that promotes *539 public confidence in the integrity and impartiality of the judiciary (Canon 2A) and by failing to avoid conduct prejudicial to the administration of justice, thereby bringing the judicial office into disrepute, and by failing to maintain the decorum and temperance befitting his office (Canon 2B); and
“• Canon 3, by failing to perform the duties of his office impartially, specifically by failing to be faithful to the law (Canon 3A(1)), by failing to maintain order and decorum in the proceedings before him (Canon 3A(2)), by failing to be patient, dignified, and courteous to litigants and others with whom he dealt in his official capacity (Canon 3A(3)), and by failing to accord to every person who is legally interested in a proceeding the full right to be heard according to law (Canon 3A(4)).
“This court notes that Judge Steens-land voluntarily retired on May 7, 2010, approximately 15 months into his most recent six-year term.
“Based on the findings of this court after a thorough consideration of all the evidence and taking into consideration the limitations on the ability of this court to sanction Judge Steensland in this matter it is hereby ordered and adjudged as follows:
“That Judge Steensland be publicly censured by the publication of this order of final judgment and public censure in a newspaper of general circulation in Houston County. This court also prohibits M. John Steensland, Jr., from ever serving as a judge in any case in any court in Alabama or from exercising any judicial authority in any manner whether now or in the future.”
(Emphasis added.) From this judgment, Judge Steensland appeals.
On appeal, Judge Steensland does not challenge the sufficiency of the evidence or the nature of the discipline imposed. He merely renews the grounds he originally asserted in his motion to dismiss the complaint: the absence of jurisdiction and the application of the doctrine of condonation.

II. Discussion

The issues presented involve only questions of law. Consequently, our review is de novo.

A. Jurisdiction

Judge Steensland contends that, “[ajfter [he] retired, inactive, on May 7, 2010, [the COJ] and [the JIC] lost jurisdiction to consider or charge or decide or inquire into events that occurred during his judicial service.” Judge Steensland’s brief, at 5-6 (emphasis added). For this proposition, he cites Johnson v. Board of Control of Employees’ Retirement System, 740 So.2d 999 (Ala.1999), and Ex parte Alabama State Bar, 3 So.3d 178 (Ala.2008). The JIC contends, and we agree, that these cases are inapposite.
The sole question in Johnson was whether Inge Johnson, who took “the oath of a retired [circuit] judge on inactive status of the State of Alabama and [was] sworn in as a United States district judge,” 740 So.2d at 1012 (emphasis added), was nevertheless still holding her state judgeship as an “ ‘office of profit’ as contemplated by [Ala. Const.1901,] § 280,” 740 So.2d at 1012, which prohibits any person “holding an office of profit under the United States” from “holding] any office of profit under this state.” 740 So.2d at 1007. This Court answered that question in the negative and held that Judge Johnson was not required to forfeit her State retirement benefits upon her appointment with the federal bench.
Judge Steensland quotes Johnson extensively for its discussion and recognition of the inapplicability of various Canons, or portions of Canons, to judges on inactive- *540 duty status and concludes with the following quotation: “ ‘A retired, inactive judge ... is not holding an office at all.’ ” Judge Steensland’s brief, at 9 (quoting Johnson, 740 So.2d at 1012). Thus, he relies on Johnson for the rather unremarkable proposition that a judge who retires from his or her office and is then on inactive-duty status is not still holding judicial office.
There is no issue regarding Judge Steensland’s current status, that is, there is no contention in the case that he is still holding his judicial office. The issue here is not the applicability of certain Canons to conduct that occurs during the period of inactive-duty retirement, as was the issue in Johnson. Judge Steensland is not charged with violating the Canons while he was out of office. The issue here is whether a judge who retires on inactive-duty status remains subject to an investigation commenced by the JIC before his retirement and remains subject to discipline by the COJ for violations of the Canons of Judicial Ethics that occurred while the judge held the office. Thus, Johnson does not aid Judge Steensland.
Ex parte Alabama State Bar is similarly inapposite for a number of reasons. That case involved an attempt by the Alabama State Bar to discipline a sitting judge for alleged violations of the Alabama Rules of Professional Conduct that had occurred before his election to the bench. Otherwise stated, the question in that case was whether the Disciplinary Board of the Alabama State Bar (“the Board”) had “jurisdiction to discipline an incumbent judge for an alleged violation of the Rules of Professional Conduct while the incumbent judge was engaged in the private practice of law.” 3 So.3d at 181. This Court answered that question in the negative. Our disposition was guided by Rule 1(a)(2), Ala. R. Disc. P., which, at that time, provided: “Incumbent judges are not subject to the jurisdiction of the Disciplinary Commission or the Disciplinary Board of the Alabama state bar.” (Emphasis added.)[1]
Moreover, it is obvious that Ex parte Alabama State Bar did not involve the contention, such as that presented here, that a former judge in inactive-duty retirement is not subject to the jurisdiction of the JIC and the COJ. Indeed, that case was rather the converse of this one and is therefore fundamentally distinguishable.
We see nothing that counsels the result advocated by Judge Steensland. The JIC and the COJ are creations of the Alabama Constitution. In setting forth the powers and duties of the JIC, Ala. Const.1901, § 156(b), provides, in pertinent part:
“The [JIC] shall be convened permanently with authority to conduct investigations and receive or initiate complaints concerning any judge of a court of the judicial system of this state. The [JIC] shall file a complaint with the [COJ] in the event that a majority of the members of the [JIC] decide that a reasonable basis exists, (1) to charge a judge with violation of any Canon of Judicial Ethics, misconduct in office, failure to perform his or her duties, or (2) to charge that the judge is physically or mentally unable to perform his or her duties.... The [JIC] shall prosecute the complaints.”
*541 (Emphasis added.) Concerning the duties of the COJ, Ala. Const.1901, § 157(a), states that “[t]he [COJ] shall be convened to hear com/plaints filed by the [JIC (Emphasis added.) Under this scheme, the JIC is constitutionally invested with the power and the duty to receive — as well as to initiate — complaints against incumbent judges.
Consistent with this scheme is Rule 6, Rules of Procedure of Judicial Inquiry Commission (“JIC Rule 6”), which, at all times relevant to these proceedings, provided, in pertinent part:[2]
“Investigations
“A. Investigations may be instituted by the commission only upon a verified complaint filed either by a member of the public or by a member of the [JIC] or the [JIC’s] staff and only upon the affirmative vote of a majority of all members of the [JIC] at a duly called meeting agreeing to investigate the complaint.
“B. Within 60 days after a complaint is filed with the [JIC], whether by a member of the public or of the [JIC], the [JIC] must meet and vote on whether to investigate the complaint. A complaint shall become void if the [JIC] fails to meet for such a vote within the 60 days allowed or if, upon the vote at a meeting, fewer than a majority of all members of the [JIC] vote to investigate it. The [JIC] shall promptly notify the judge named in the complaint upon its becoming void.
“C. Within 21 days after any person, whether a member of the public or of the [JIC], files a complaint with the [JIC], the [JIC] must serve upon the judge who is the subject of the complaint copies of the complaint and any and all materials of any nature whatsoever constituting, supporting, or accompanying the complaint.
“D. Within 21 days of instituting an investigation upon the vote required by subdivision A of this rule, the [JIC] must serve on the judge to be investigated a full description of the conduct to be investigated and all information received, gathered, or possessed by the [JIC] tending to establish or to refute that the conduct occurred or that the investigation is appropriate and must serve on the judge copies of any and all documents, photographs, tape recordings, transcripts, notes, and other materials of any nature whatsoever tending to prove or to disprove the occurrence of the conduct to be investigated or the appropriateness of the investigation.
“E. Every six weeks after serving the disclosures, statements, and materials required by subdivision- D of this rule, the [JIC] must serve- on the judge being investigated or to be investigated copies of any and all materials of any nature whatsoever not already served upon him or her tending to establish that the conduct either did or did not occur or that the investigation is or is not still appropriate and shall serve upon the judge a full statement of whether the [JIC] then intends to continue the investigation.... ”
(Emphasis added.)
The veritable laundry list of mandatory, investigation-related duties cast upon the JIC by JIC Rule 6 follows upon, and results from, the filing of a verified complaint “by a member of the public or by a member of the [JIC] or the [JIC’s] staff.” JIC Rule 6.A. In other words, it *542 is the filing of a complaint with the JIC that invokes the JIC’s jurisdiction. The complaints that initiated the JIC’s investigation of Judge Steensland were filed with the JIC before Judge Steensland retired.[3]
“Once the jurisdiction of a court or administrative agency attaches, the general rule is that it will not be ousted by subsequent events.” In re Peoples, 296 N.C. 109, 146, 250 S.E.2d 890, 911 (1978). The jurisdiction of the court or administrative agency, thus invoked, continues until the process is completed. See In re Marriage of Clark, 232 Ill.App.3d 342, 347, 173 IlLDec. 532, 597 N.E.2d 240, 243 (1992) (“It is clear' that once jurisdiction attaches in a cause, it continues until all issues of fact and law have been finally determined.”). Indeed, the COJ is constitutionally required to convene and to entertain the charges brought by the JIC.[4] See In re Fuyat, 578 A.2d 1387, 1388-89 (R.I.1990) (“[A] judge ... who has removed himself or herself from judicial office by resignation [during the pendency of an investigation commenced by the ‘Commission on Judicial Tenure and Discipline’ (‘the commission’), but before the ‘institution of formal proceedings,’] is not by that fact immune from action by the commission, which may recommend some sanction other than removal.”). In short, we hold that Judge Steensland’s retirement during the JIC’s pending investigation of the complaints filed against him did not deprive the JIC or the COJ of jurisdiction to adjudicate the charges in the complaint.

B. Condonation

“Simply stated, the ‘condonation theory1 is that re-election to an office operates as a condonation of the officer’s conduct during the prior term.” Parker v. State, 333 So.2d 806, 808 (Ala.1976). According to Judge Steensland, the COJ considered evidence of conduct that occurred during his prior terms of office and, in doing so, ran afoul of this doctrine.
The condonation doctrine was the topic of prolonged discussion between the parties before the COJ. During one such discussion, Judge Steensland’s counsel stated:
“[The JIC has] got charges here where [Judge Steensland] is accused of doing— taking some action.... Some of them, they say, occurred between 2004 and 2006. Some of them, they say, beginning in 1996. He’s been on the bench— he got elected first, I think, in '88; took office in January of '89. And so he is very limited, if at all — which we say they’ve got no jurisdiction over the retirement part of it — but if at all, they’re limited to what occurred from January 20, 2009, up until the rest of that term. And so any — we say all of it ought to be thrown out. We say you have no juris *543 diction. But we’re not waiving that argument. If your Honor rules against us, all of it that’s before 2009 must come out under the well-settled law of Alabama. ...
“There is law that some evidence of things in prior terms could be admitted to show a pattern and practice, but it is not charged. Here they have charged it, and putting him on trial. And all of that should be struck. And if admitted, admitted to show pattern and practice.”
(Emphasis added.)
Subsequently, the chief judge of the COJ questioned counsel for the JIC as to the purpose of evidence of the pre-2009 conduct. Counsel for the JIC responded, in pertinent part:
“[When we talk about these acts prior to [2009], we’re also talking about the same conduct that occurred after the date that he was sworn into this term.... During [Stacie R.’s] case, she will testify, I anticipate, and another witness who was there who also has a complaint, who filed a complaint who was there that day. And about three or four other people will all testify that during the course of that day, the following things' were done: Handcuffs; severe sentence for somebody tried; vulgar language; demeaning language. All of these things that we have alleged that occurred prior to 2009, they were occurring ... when [Stacie RJ and [Julie M.] were in the courtroom. And we have alleged in these following counts a pattern and practice account where we’re going through these things....
“... We are showing pattern and practice. The pattern and practice did not start after his term here. It started long before his term here, and it continued into his term.”
(Emphasis added.)
 According to the JIC, “[t]he COJ found that the judge had a pattern and practice of using ‘profanity’ and ‘yellfing’] at litigants from the bench.” The JIC’s brief, at 8 (emphasis added). Indeed, one examines the COJ’s order in vain for proof that the COJ used pre-2009 conduct as anything but pattern-and-practice evidence. On the contrary, the order is expressly based on the conduct charged in the four complaints filed with the JIC by Stacie R., Julie M., Natasha H., and Cynthia M. — that is, counts 1 through 4, which include charges 1 through 35 — all of which occurred within Judge Steensland’s last term of office.
“It is ... well settled ‘that a party may not induce an error by the trial court and then attempt to win a reversal based on that error. “A party may not predicate an argument for reversal on ‘invited error,’ that is, ‘error into which he has led or lulled the trial court.’ ” ’ Mobile Infirmary Med. Ctr. v. Hodgen, 884 So.2d 801, 808 (Ala.2003) (quoting Atkins v. Lee, 603 So.2d 937, 945 (Ala.1992), quoting in turn Dixie Highway Express, Inc. v. Southern Ry., 286 Ala. 646, 651, 244 So.2d 591, 595 (1971)).”
White Sands Group, L.L.C. v. PRS II, LLC, 998 So.2d 1042, 1057 (Ala.2008).
In his argument before the COJ, Judge Steensland’s counsel condoned the use of pre-2009 conduct to show a pattern and practice. For all that appears, that is precisely the purpose for which that evidence was used. Thus, to the extent the COJ considered the conduct at all, the error — if any — was invited error. Consequently, reversal of the COJ’s judgment cannot be predicated on evidence of Judge Steensland’s alleged pre-2009 conduct.

III. Conclusion

For the above-stated reasons, the COJ did not err in entering a judgment against *544 Judge Steensland. That judgment is, therefore, affirmed.
AFFIRMED.
MALONE, C.J., and STUART, BOLIN, PARKER, MURDOCK, SHAW, and MAIN, JJ., concur.
WISE, J., recuses herself.

. In his dissenting opinion in Ex parte Alabama State Bar, Justice Lyons called upon the Court to amend Rule 1, which we promptly did. As amended, Rule 1(a)(2) provides: "Incumbent judges are subject to the jurisdiction of the Disciplinary Commission and the Disciplinary Board of the Alabama State Bar during their terms of office for misconduct occurring before they became judges.'' (Emphasis added.) The amendment of Rule 1(a)(2) effectively overruled the Court's holding in Alabama State Bar.

. JIC Rule 6 was amended effective May 1, 2010. The amendment substantially rewrote Rule 6.

. We leave for another day the question — not presented here — of the consequences of a judge’s retirement before a complaint is filed with the JIC.

. It is no argument against the exercise of jurisdiction by the JIC and the COJ that the Alabama State Bar may also discipline former judges pursuant to Rule 1(a)(3), Ala. R. Disc. P. (“Former judges who have resumed their status as lawyers are subject to the jurisdiction of the Supreme Court of Alabama and the Disciplinary Commission and the Disciplinary Board of the Alabama State Bar for misconduct that occurred while they were judges, before they became judges, or after the resumption of the practice of law and that would have been grounds for lawyer discipline.”). The fact that the Disciplinary Commission, the Disciplinary Board, and this Court do have jurisdiction over former judges does not imply the reverse, that is, that the JIC and the COJ do not have jurisdiction. On the contrary, if concurrent jurisdiction now exists over incumbent judges pursuant to Rule 1(a)(2), Ala. R. Disc. P., it is logically not precluded over former judges by Rule 1(a)(3).